**STATE AUTO MUTUAL INSURANCE COMPANY, Plaintiff,**

v.

**Edward McINTYRE, Daisy McIntyre, and Dawn Marie Yoder, by and through her next friend Terry Buck, Defendants.**

**Cv. No. 86–HM–5290–NW.**

United States District Court,
N.D. Alabama,
Northwestern Division.

Jan. 27, 1987.

David K. Howard, Almon, McAlister, Tuscumbia, Ala., Ashe, Baccus & Tanner, for plaintiff.

Jimmy Sandlin, Schuessler & Sandlin, and Cindy Sandlin Schuessler, Lindsey G. Mussleman, Holt, McKenzie, Holt & Mussleman, Florence, Ala., for defendants.

## MEMORANDUM OF DECISION

HALTOM, District Judge.

This is an action for declaratory judgment brought by plaintiff State Automobile Mutual Insurance Company ("State Auto Mutual") against defendants Edward McIntyre and wife, Daisy McIntyre (insureds), and Dawn Marie Yoder, minor granddaughter of defendant Edward McIntyre, to determine coverage under a homeowner's liability insurance policy issued by State Auto Mutual to the McIntyres for assault and battery on two separate occasions in the form of nonviolent sexual abuse by the defendant grandfather of his minor granddaughter, Dawn Marie, during her 1983 and 1984 summer visitations at the McIntyre home in Lauderdale County, Alabama.[1]

At all times herein relevant State Auto Mutual insured Edward McIntyre and wife, Daisy McIntyre, against personal liability for bodily injury or property damage in amount of $100,000 for each occurrence with express Section II exclusion applicable to Coverage E—Personal Liability and Coverage F—Medical Payments to Others which provided that Coverage E and Coverage F do not apply to *bodily injury* or *property damage:*

> (a) which is expected or intended by the insured.
>
> [Defendant's Exhibit 1, Homeowners Policy Issued by State Automobile Mutual Insurance Company.]

The plaintiff insurance company seeks a declaratory judgment in this case that the above referenced policy exclusion applies in the instant case so as to exclude coverage for Dawn Marie Yoder's claim for damages against her grandfather McIntyre arising out of his sexual abuse of her in the summers of 1983 and 1984. Counsel for the McIntyre and Yoder defendants assert that the bodily harm alleged to have been sustained by the minor child, Dawn Marie Yoder, as the result of her sexual abuse by her grandfather was neither expected or intended by him as one of the insured parties under the State Auto Mutual homeowner's policy, thus requiring the plaintiff insurer to provide coverage for the minor granddaughter's bodily injury claim against her grandfather for sexual abuse.

---

1. Dawn Marie Yoder was 11 years of age at time of trial. At the time of the 1983 incident she was 8 years of age. She was 9 years of age at the time of the 1984 incident. One of her counsel of record, Jimmy Sandlin, was appointed and serves as her guardian ad litem in this litigation.

In an underlying tort action tried before a jury at the Federal Courthouse in Florence, Alabama this 11–year old minor on October 23, 1986 recovered judgment against her grandfather McIntyre in total amount of $125,000.00 [compensatory damages in amount of $50,000.00 and punitive damages in amount of $75,000.00] for and on account of the sexual abuse referenced in the within declaratory judgment action.[2] Final judgment was duly entered by the Court in the tort action in favor of the minor plaintiff and against the defendant Edward McIntyre in conformity with the jury verdict. Defendant Edward McIntyre's motion for judgment notwithstanding the verdict and alternative motion for remittitur or new trial was denied by this Court without opinion on November 3, 1986. On November 28, 1986 Defendant Edward McIntyre gave Notice of Appeal to the United States Court of Appeals for the Eleventh Circuit. This appeal in the tort action is now pending.

Pursuant to Rule 52, Fed.R.Civ.P., the Court now finds the facts specially and states separately its conclusions of law thereon in this declaratory judgment action.

## FINDINGS OF FACT

At all times pertinent in this litigation the minor child, Dawn Marie Yoder, lived with her mother, Terry Buck (Huffstutler), in the State of Indiana.[3] Subsequent to her 1984 Alabama summer visit with her grandfather McIntyre the child was enrolled as a 4th grade student at Walt Disney School in South Bend, Indiana. On October 31 of that year a "Big Bear-Little Bear" play was presented at Dawn's school which depicted Little Bear's "private spot"

being touched by a grown bear.[4] Little Bear told a responsible adult bear of this episode. The thrust of the play was to encourage school children to report similar instances in which they had been sexually abused. Thus motivated, Dawn promptly told her teacher of her sexual abuse by her grandfather. The teacher instructed Dawn to tell one of the ladies in the play. This lady told the child to tell her mother. Dawn immediately told her mother of the Alabama summer visit incidents. The mother reported these alleged sexual molestations to the local Indiana police. The end result was an Alabama grand jury investigation and an indictment by the Lauderdale County, Alabama grand jury on March 4, 1985 charging the defendant Edward McIntyre with two Class C felony counts of sexual abuse in the first degree under 13A–6–66, Ala. Code 1975, as amended, and a third felony count of child abuse under the Alabama Child Abuse Act, 26–15–1, *et seq.*, Ala. Code 1975, as amended (Count III), all involving Dawn Marie Yoder.

On April 17, 1985 the defendant grandfather, represented by counsel, entered a plea of not guilty and not guilty by reason of mental disease or defect to the charges in the indictment in the Lauderdale County Circuit Court. At that time counsel made known to the court that Mr. McIntyre was just recently released from the hospital and was under psychiatric treatment. The case was set for trial on May 28, 1985 with settlement conference on May 23, 1985 before Circuit Judge Ned Michael Suttle. For reasons not disclosed of record, these May 1985 trial and settlement conference

---

**2.** The two cases were consolidated for trial and were tried simultaneously. The declaratory judgment action was heard nonjury. The same evidence heard by the jury in the tort action was heard by the Court in the nonjury case. However, additional evidence was presented in the bench hearing which was not heard by the jury.

**3.** At the time of the jury trial and bench hearing the mother of Dawn Marie Yoder had been married four times to four different men: (1) Steven Yoder, father of Dawn Marie; (2) Tom

Reynolds; (3) Russel Buck; and (4) Moe Huffstutler. During the last few months of 1974 and the first few months of 1975 the mother and child lived with a "guy" named Bobby Hill in the western portion of Lauderdale County, Alabama.

**4.** Dawn Marie Yoder in testimony before the jury in this Court referred to her vagina as her "private spot."

settings were continued for approximately one month.

On June 20, 1985 defendant Edward McIntyre, represented by Attorneys Donald E. Holt and Lindsey Mussleman, appeared before Judge Suttle in the Lauderdale County Circuit Court in Florence, Alabama. The State was represented by two special prosecutors from the District Attorney's Office in Franklin County, Alabama. The court announced that there was a request by the defendant McIntyre to enter a guilty plea and that a plea bargain had been effected in the case. The indictment, which did not specify the period of time in which the offense was alleged to have occurred, was amended by consent. The State with of record consent by defendant and counsel moved for dismissal of Counts I and III of the indictment and further moved to amend Count II by specifying that the offense of sexual abuse in the first degree therein charged occurred in August 1984. The court thereupon proceeded to orally question defendant for the purpose of establishing of record that the defendant's proferred plea of guilty to Count II of the indictment was knowingly, voluntarily and understandingly entered. The Court observed of record in the presence and hearing of defendant McIntyre with counsel by his side that the plea agreement provided that the State would recommend a 6-year sentence and that there would be no further indictments in the future involving Dawn Marie Yoder, Amanda McIntyre or Deborah Jones.[5] The defendant thereupon

acknowledged of record his understanding of such plea agreement and his knowledge that he faced a maximum penalty of up to 6 years if his guilty plea was accepted.[6] After further extensive litany required by Alabama guilty plea procedure, the court then inquired of record of the defendant whether he pled guilty or not to Count II of the indictment charging sexual abuse in the first degree. Counsel for McIntyre then apprised the court on the record that the defendant McIntyre had noted in his Request To Enter A Guilty Plea that he requested to plead guilty under the provisions of the *Alford* case,[7] that defendant suffered a psychotic episode about the time he was charged and received [electric] shock treatments; that the medical evidence, if offered, would show that shock treatments affect memory somewhat; that he (counsel) had explained to defendant all of the evidence of which he (counsel) was aware that the State would offer against him if the case went to trial; that he (counsel) had advised defendant there was a substantial likelihood of conviction; that defendant had responded (to counsel) that due to his health condition and the shock treatments and psychosis he suffered he had no independent recollection of the acts charged against him; but that based on counsel's representations to him of what the evidence was and would be he felt he would be convicted and that it was to his best interests to enter a plea under the plea bargain agreement. Accordingly, stated counsel to the court, the defendant offered

---

5.  Amanda McIntyre is the daughter of Edward McIntyre's brother. She was 15 or 16 years old at the time of trial. Edward McIntyre testified before this Court out of the presence and hearing of the jury. He denied fondling his niece, Amanda, or having sex with her but admitted he had heard that Amanda said he did. His wife told him.

    Edward McIntyre also testified in the in-chambers bench hearing concerning an episode with Deborah Jones, then 12 or 13 years of age, as she was riding on the back of his motorcycle headed home from the National Parkway Beach. His version: "She tried to kiss me while we were on the motorcycle. I turned off a little side road. She just practically raped me—very passionate. I felt of her—felt of her vagina." He denied having sex with Deborah.

6.  The Count II felony offense charged in Count II of the indictment carries a maximum punishment of ten years and a minimum punishment of one year and one day.

7.  *North Carolina v. Alford,* 400 U.S. 25 at pp. 37–38, 91 S.Ct. 160, at pp. 167–68, 27 L.Ed. 162 (1970), commonly known as the *Alford* case, holds that an accused may voluntarily, knowingly and understandingly consent to the imposition of a prison sentence even though he is unwilling to admit participation in the crime, or even if his guilty plea contains a protestation of innocence, when he concludes that his interests require a guilty plea and the record strongly evidences guilt.

to enter his guilty plea under the provisions of the *Alford* case. Thereupon, defendant McIntyre formally proferred his plea of guilty to amended Count II of the indictment. The special prosecutors were then asked by the court to state of record the substance of the case against the defendant. In response Special Prosecutor McDowell informed the court that the substance of the case would be that on or about August of 1984 Dawn Yoder, then 9 years old, was at the house of the defendant Edward McIntyre and that at such time and place defendant fondled or touched her private parts, specifically, her vagina. Moreover, asserted the prosecutor, the State would offer evidence of statements made by defendant corroborating his commission of the criminal act charged against him and would attempt to offer other evidence of other sexual molestation by the defendant of Deborah Jones and Amanda McIntyre. Other intensive question and answer interrogation of defendant by the court followed, including a statement of record by Mr. McIntyre that he believed it would be a likelihood he would be convicted and that he was entering into the plea agreement because he thought it was in his best interest to take the plea agreement of 6 years rather than stand trial and face a possibility of a 10-year sentence. Counsel for Mr. McIntyre emphasized of record that an essential part of the plea agreement was the agreement of the State not to seek further indictments against the defendant. Counsel added that there was certainly a likelihood or a probability of other indictments, except for the plea bargain, further noting that Mr. McIntyre's position was that in view of his health and the fact that he had suffered heart attacks it was in his best interest to enter the plea and get all of the possible prosecutions behind him.

Counsel for defendant both confirmed of record their opinion that it was to Mr. McIntyre's best interest to enter into the plea bargain agreement. Defendant's counsel also expressed opinion that Mr. McIntyre was conscious and aware of the charges against him and was generally capable of understanding the procedure that day being followed by the court in the McIntyre case. Mrs. Daisy McIntyre (wife of defendant), Greg McIntyre (adult son of defendant) and Martha Orrick (sister of defendant) were next questioned by the court of record. All three testified that Edward McIntyre, in their opinion, knew what was going on with respect to the guilty plea procedure and understood the consequences of what he was doing. The Court thereupon accepted of record Mr. McIntyre's plea of guilty to Count II, as amended, of the indictment, adjudged him guilty of Sexual Abuse in the First Degree, as charged, dismissed Counts I and III on motion of the State and continued the case for sentencing until July 12, 1985 at 9:00 A.M. Probation was requested.

Under date of July 29, 1985 Circuit Judge Ned Michael Suttle of the Lauderdale County Circuit Court, after hearing,[8] denied Edward McIntyre's request for probation and sentenced him to serve 6 years in the state penitentiary. His incarceration commenced two weeks later.[9] From that time to and through trial date Mr. McIntyre was and still remains a state prison inmate. His presence at trial was secured through the issuance of an appropriate writ by this Court.

### TESTIMONY OF DAWN MARIE YODER

Dawn Marie Yoder in small voice testified at length before the jury. She re-

---

8. Pam McIntyre, adult daughter of defendants Edward McIntyre and Daisy McIntyre, testified in support of her father's request for probation. She admitted in response to questions put to her by the special prosecutor that her father molested her when she was a child, a fact kept secret to herself.

9. All of the facts above referenced concerning Mr. McIntyre's indictment by the Lauderdale County, Alabama grand jury, the resulting plea bargain agreement, his plea of guilty to amended Count II of the indictment and his 6-year custody sentence for Sexual Abuse In The First Degree imposed by the Lauderdale Circuit Court appear in the certified transcript of the court proceedings in the case of *State of Alabama vs. Edward McIntyre*, CC 85-184, Circuit Court of Lauderdale County, Alabama, introduced and received in evidence in the nonjury hearing of this action for declaratory judgment.

counted haltingly but in some detail her visits in her grandfather's Alabama home in the summers of 1983 and 1984. In 1983, as she and her grandfather McIntyre were lying on the couch in the living room watching television before supper, the first incident occurred. She was wearing a nightgown and underpants and was covered by a blanket. "He put his hand down my pants and touched me in my private spot." He put his finger inside me. It hurt a little bit—like a burn or something." The 11–year old witness testified that her grandfather kept his finger "inside her" about 25 minutes and took his hand out [of her pants] on his own. She then left and went to the bathroom. Dawn Marie's version of the 1984 summer visit episode was substantially the same as described in her testimony respecting the 1983 incident. Again, she was wearing a nightgown and underpants. She testified that "he put his finger inside me again—more than just a few minutes." Dawn Marie testified that she thought about these incidents with her grandfather but didn't tell anybody until after the school play in the fall of 1984. "I was scared," said she. When asked as to her feelings about these episodes she testified: "I feel kinda hurt sometime. My grandfather was supposed to love me—not to hurt me." She stated that she was "down here" to punish her grandfather.

The Court fully credits the testimony of this 11–year old child, finding her testimony to be both creditable and believable with respect to both instances of sexual abuse.

## TESTIMONY OF EDWARD McINTYRE

The defendant grandfather, Edward McIntyre, testified before the jury and also in chambers before the Court. At the time of trial he was 49 years of age and was incarcerated in a minimum security facility of the State of Alabama. Mr. McIntyre recalled both the 1983 and 1984 summer visits of his granddaughter, Dawn Marie Yoder. In 1983 his daughter, Terry, and her then husband, Russell Buck, accompanied his granddaughter. He remembered and related taking Dawn Marie for rides on his motorcycle and at times being alone with her watching television. He testified: "What time I didn't ask her she piled up on me." He told of his several visits with his daughter and granddaughter in Indiana and bringing them both to Alabama. He stated that he, his wife Daisy and his son, Greg, went to Terry's wedding in Indiana in 1982. Mr. McIntyre also recalled the summer visit of Terry and Dawn Marie in his home in 1984.

The defendant grandfather gave evasive answers to questions put to him concerning his alleged sexual molestation of his minor granddaughter during her 1983 and 1984 summer visitations in his home. He described his memory as being "jumbled up." He first outright denied sexually abusing his granddaughter and then equivocated by saying: "I don't think I done it." "I'm almost certain it didn't happen." He then testified concerning his recollection of watching television with Dawn Marie. He was sitting on the couch. She sat on him; "piled up on me." He remembered his hand in her pants. "She pushed his hand down on her stomach—pushed his hand down in her pants." His hand touched her privates." It was a push—a deliberate push on her part." "It lasted a half minute or minute—I wasn't expecting it." "She just shoved it down there." "It did not go up inside her—not that I know of—I can't remember." Mr. McIntyre testified: "It was a deep shock to me." Dawn was 9 years old—summer of 1984. He stated she was "experimenting." He further testified: "I'm saying I don't think I did it; I don't believe I did it."

Mr. McIntyre told of his first marriage to Doris McIntyre, mother of his daughter, Terry Buck Huffstutler. They were separated when Terry was born. He did not know where. His second marriage was to Daisy McIntyre, his present wife and mother of his daughter Pam (then 24) and his son, Greg (then 25).

The defendant grandfather denied attempting to have sex with his daughter, Pam, when she was 15 or 16 years old at a time when he was drunk. He testified: "I

don't believe it happened; if I did, I don't remember it." He stated that he never had sex with a minor child except when he was a child himself. He denied fondling Amanda McIntyre, his brother's daughter who was 15 or 16 years old at time of trial, but admitted he had heard from his wife that Amanda claimed that he did. He related to the Court and jury his recollection of the motorcycle riding incident with Deborah Jones at a time when she was 12 or 13 years of age. This episode is briefly recounted in footnote 5, *ante.*

Edward McIntyre described his guilty plea to the charge of First Degree Sexual Abuse as being produced by fear.

From close observation of this defendant during the trial, including the time his testimony was presented both in the courtroom and in chambers, and a careful analysis of his testimony, the Court concludes and finds that Mr. McIntyre's equivocal denials of his sexual molestation of his minor granddaughter, Dawn Marie Yoder, are unworthy of belief. And the Court is fully persuaded and finds from all of the evidence that this defendant grandfather did in fact in a nonviolent way sexually abuse his minor granddaughter, Dawn Marie, in the summers of 1983 and 1984 when she was 8 and 9 years old respectively by placing his hand on her "private spot" and by inserting his finger therein. Moreover, the evidence in this case supports the Court's finding of fact here made that for a period of years preceding the 1983 and 1984 episodes in question Mr. McIntyre has indulged himself in nonviolent sexual molestation of females of tender years, including his own daughter, Pam McIntyre. However, there is no evidence of other sexual abuse or related criminal charges being made against him and he has no other criminal convictions of consequence. This evidentiary record shows Mr. McIntyre to otherwise have been a good, reputable citizen and a hardworking man prior to his 1985 criminal conviction for sexual abuse.

While this record does show Mr. McIntyre's intermittent bouts of over-indulgence in alcoholic beverages in his younger years, there is no evidence that he was under the influence of alcohol or even "drinking" at the time of the occurrences in question. From his courtroom demeanor and testimony, the Court finds the defendant Edward McIntyre to be of average intelligence.

The Court's findings of fact with respect to the factual issue of whether this defendant grandfather expected or intended to cause bodily injury to his minor granddaughter by his sexual abuse of her during the child's summer visitations in the McIntyre home in 1983 and 1984 are hereinafter set out in a separate section of this memorandum of decision.

## PSYCHIATRIC EVIDENCE

Dr. Joseph W. Glaister, a psychiatrist associated with the Riverbend Center For Mental Health in Florence, Alabama, whom the Court recognized and accepted as an expert witness in his medical field, was called to testify on behalf of the defendant Edward McIntyre. Dr. Glaister first treated the defendant grandfather in March 1985 when he was seen by the doctor in the emergency room of Eliza Coffee Memorial Hospital (ECM) in Florence in an acutely depressed and disturbed state. He was admitted to the hospital's "400 unit," a 39–bed psychiatric section of ECM, where he developed acute suicidal psychosis. Dr. Glaister related the history of this patient from his medical records but did not provide the source or sources. Mr. McIntyre had a history of alcoholism.[10] Every one of his daughters, except one, had been molested by him in their childhood. He once attempted sex by force with his 16–year old daughter when drunk. Dr. Glaister testified that he administered electric shock treatment to Mr. McIntyre who suffered a coronary occlusion about 20 minutes later. Dr. Glaister diagnosed Edward McIntyre as suffering from pedophilia which he de-

10. There is no other evidence in this record warranting a finding of fact that Edward McIntyre was or is an alcoholic and this Court de-

clines to make such a finding on the basis of Dr. Glaister's recollection of the history of this patient.

scribed as a compulsion of an adult to have sex with a child or children. He related that the defendant McIntyre told him that "girls made him commit this act" and "that women controlled his life."

## BODILY INJURY SUSTAINED BY MINOR CHILD CAUSED BY THE SEXUAL ABUSE

In the jury trial of the underlying tort action counsel of record for the minor plaintiff presented an array of evidence concerning the psychological harm [11] inflicted upon Dawn Marie Yoder by her grandfather's sexual abuse of her during her summer visitations in the McIntyre home in 1983 and 1984. This evidence came in the form of oral testimony from her mother, Terry Buck Huffstutler, an Alabama licensed PhD psychologist, Dr. Bonnie Dean Atkinson of Florence, Alabama, who first saw this minor plaintiff in a 2–hour session on September 24, 1986 (approximately one month prior to trial) and again on September 25th and 26th for a 2–hour and 1–hour session respectively and an Indiana licensed PhD psychologist, Dr. Michael Rupley, who had been counseling Terry Buck Huffstutler, the mother, for several months prior to Dawn Marie telling her mother on October 31, 1984 after the school play of the summer incidents in 1983 and 1984 involving her sexual abuse by her grandfather McIntyre and who interviewed the minor child on two occasions in November 1984 at the mother's request.

Since Dr. Rupley saw this minor child almost immediately after Dawn Marie told her mother of the 1983 and 1984 episodes at her grandfather's house, his expert witness testimony before the Court and jury is first summarized. Significantly, this Indiana psychologist apparently made no recommendation for immediate counseling. He found from his two November 1984 interviews: (1) that the child's grades were not suffering ill effects; (2) she experienced no negative physical effects; (3) she experienced no withdrawal; and (4) there was no significant amount of denial. He testified of his impression from the child's account of the sexual abuse episodes that "the abuse did in fact occur." Dr. Rupley related to the Court and jury that he had told the child's mother following his November 1984 sessions with Dawn Marie that it was absolutely mandatory that she ultimately get counseling for the child by a certified child psychologist. This counseling was to occur in her adolescent years—for six weeks. Then for a year once a week, with progress monitored. He further recommended that the minor child receive expert counseling before marriage and after five years into marriage.

It is undisputed that Dawn Marie's mother did not return the child to Dr. Rupley or to any other psychologist for counseling or other treatment following the two November 1984 sessions in Dr. Rupley's office until almost two years later as the October 1986 trial date approached. Without faulting them for doing so or suggesting any impropriety, it is obvious that as trial date loomed, able and industrious counsel of record for this minor child were looking for a favorable expert witness in the field of child psychology and child abuse and found one in Dr. Bonnie Dean Atkinson.

---

11. There is scant evidence in this record that Dawn Marie sustained physical injury or negative physical effects as a result of the 1983 and 1984 sexual abuse incidents. Dr. Rupley testified he found no negative physical effects. The minor child testified that she experienced fleeting physical pain (akin to burning) when her grandfather's finger was inserted in her "private spot." The mother of the child testified of her observations that Dawn Marie appeared "more sensitive," "tired easily," "wanted to be alone," "would go to her room," "walked in her sleep," and "lack of concentration." However, she also testified that there was nothing wrong with Dawn Marie that she could tell at the time of and after the 1983 visit and noticed nothing unusual about her daughter during or following the 1984 visit. She further testified that the child was not afraid of her grandfather, that she saw nothing different about her child, and labeled the 1983 visitation to Alabama "as a very good visit." Because the mother failed to inform the Court when these quoted observations were made by her, no finding can reasonably be made or inference drawn that her observations were made at a time or times in near proximity to either the 1983 or 1984 incidents.

Dr. Bonnie Dean Atkinson received her undergraduate degree in elementary education, at least one master's degree in psychology and her doctor's degree in that same field. She was licensed as a psychologist by the State of Alabama in 1981. She has an extensive background of working with children. Approximately two-thirds of her practice is in child psychology. She sees approximately 100 children per year who have been or are currently being sexually abused. The Court recognized the extensive training and experience of Dr. Atkinson in her profession and accepted her as an expert witness in the proffered area of child psychology and child abuse.

As previously noted, Dr. Atkinson first saw Dawn Marie Yoder on September 24, 1986 for two hours. She had another 2–hour session with the child the following day and a third and final 1–hour session with her on September 26, 1986.

Dr. Atkinson testified that she has dolls with genitals in her office and utilizes them as effective tools in her child counseling sessions. She related that Dawn Marie took one of the dolls and demonstrated exactly what she was told by the child respecting the sexual abuse episodes involving her grandfather. Dr. Atkinson had a firm professional opinion that the minor child was telling the truth. "Children don't make these things up," she said. She proffered her opinion that the child was obviously under stress but did not show much emotion. Dr. Atkinson used the word "denial" in professionally describing the child's psychological reaction to the highly stress-laden situations to which she had been subjected. The expert witness described her professional assessment of the child as "very cooperative," "a mild mannered youngster," "anxious to do well," and "who berated herself." Her average IQ was stated to be 94, within normal range. Her "thinking style" showed no serious

disturbance. Her reading level was like that of a child beginning the 5th grade. Her spelling level was normal. Her score in arithmetic was well below normal and on a 3rd grade level, denoting a simple learning disability.

Dr. Atkinson testified that the child was becoming overly identified, overly feminine. She was a caricature of femininity, typical of victimization. She stated that sexual abuse victims quit trying and need intervention—professional help. She testified that Dawn Marie perceived herself as immobile and helpless, noting that the child drew a picture of herself (upon request) in a very unusual way. The child psychologist related that psychologically the minor child was fearful and distraught. She observed that the child was a caretaker of other people's feelings, a professional conclusion drawn by the expert witness from the child telling her of her mother and family-life history. She related that this self-relegated position was typical of a child abuse victim. Dr. Atkinson described Dawn Marie as dysfunctional in a social sense and as a result might go from one marriage to another when reaching maturity. She testified that 65% to 75% of prostitutes had been sexually abused. Child abuse victims, she said, had a very high risk for maladjustment in adulthood and added that Dawn Marie fell into that category as a result of her sexual molestation by her grandfather.

Dr. Atkinson recommended that Dawn Marie Yoder be given two to three years of intensive psychotherapy (open-ended therapy), one hour per week, 50 weeks per year, for three years,[12] to counteract or palliate the psychological trauma to which she had been subjected by the sexual abuse experiences. She testified that it was her expert opinion that Dawn Marie exhibited pseudo-maturity and that her sense of herself was not healthy.[13]

---

12. This expert witness testified that her regular and customary charge for such psychological counseling was $60.00 for a 50–minute hour; in Dallas, Texas it is $95.00 per hour; and in New York City the charge is $110 per hour.

13. The Court is constrained to note that Dr. Atkinson's testimony, particularly that portion wherein she stated her professional recommendation that the child needed two or three years of intensive psychotherapy because of the 1983

## POLICY EXCLUSION

The evidence is uncontroverted that a State Auto Mutual homeowner's liability policy had been issued to defendants Edward McIntyre and wife, Daisy McIntyre, which was in force and effect at the time of the 1983 and 1984 incidents of sexual abuse of the minor defendant, Dawn Marie Yoder, by her grandfather McIntyre. It is also uncontroverted that such policy contained a Section II exclusion applicable to Coverage E—Personal Liability and Coverage F—Medical Payments To Others which provided that Coverage E and Coverage F do not apply to *bodily injury* or *property damage:*

(a) which is expected or intended by the insured.

## FACTUAL ISSUE OF WHETHER DEFENDANT GRANDFATHER EXPECTED OR INTENDED TO CAUSE BODILY HARM TO HIS MINOR GRANDDAUGHTER WHEN HE SEXUALLY ABUSED HER

Before making findings of fact with respect to the factual issue of whether bodily harm to the minor defendant, Dawn Marie Yoder, was expected or intended by her grandfather, defendant Edward McIntyre, when he sexually abused her on the two occasions in question, the Court must first ascertain the proper standard to be applied in weighing the facts in this evidentiary record.

Under *Erie Railroad v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), a federal court in a diversity action must apply the controlling substantive law of the state. The construction of insurance contracts is governed by substantive state law. *Dempsey v. Auto Owners Insurance Co.,*

717 F.2d 556, 559 (11th Cir.1983). The Court notes that the homeowner's policy or policies at issue here were issued to Alabama insureds, delivered to Alabama insureds residing in the State of Alabama, and that the incidents of sexual abuse which precipitated this controversy occurred in Alabama.

The latest, most authoritative decisions of the Supreme Court of Alabama interpreting this homeowner's insurance policy exclusion and determining the proper standard to be employed to ascertain whether another's bodily injury was either "expected or intended by the insured" are thus controlling in this federal court diversity of citizenship declaratory judgment action. Moreover, this Court is bound to here follow state law, whether or not the Court agrees with the reasoning upon which it is based or the outcome which it dictates. *Delta Air Lines, Inc. v. McDonnell Douglas Corp.,* 503 F.2d 239, 245 (5th Cir.1974), *cert. denied* 421 U.S. 965, 95 S.Ct. 1953, 44 L.Ed.2d 451 (1975); [14] *Silverberg v. Paine, Webber, Jackson & Curtis, Inc.,* 710 F.2d 678, 690 (11th Cir.1983); *Provau v. State Farm Mut. Auto. Ins. Co.,* 772 F.2d 817, 820 (11th Cir.1985).

In *Alabama Farm Bureau Mut. Cas. Ins. Co. v. Dyer,* 454 So.2d 921 (Ala.1984), the Supreme Court of Alabama considered a standard form insurance policy exclusion virtually identical to the exclusion clause in the instant case in an effort to determine whether an insured's shooting of his brother was "expected or intended from the standpoint of the insured." In *Dyer* the insurer brought a declaratory judgment action to determine its obligation, if any, to defend and provide coverage to the in-

---

and 1984 incidents of sexual abuse, was received by the Court "with a grain of salt." With no disparagement intended, the Court observes that Dr. Atkinson's repeated references to "what the literature says" left the Court with the feeling that this "literature" was doing the testifying concerning a hypothetical child abuse victim rather than the expert witness testifying concerning this 11-year old actual victim of her grandfather's sexual abuse whom this expert witness never saw until over two years after the

last incident over three years and after the first incident. Moreover, the mother's testimony recounted in n. 11, *ante,* does not appear altogether compatible with Dr. Atkinson's testimony.

**14.** The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11 Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

sured's estate in the insured's brother's estate wrongful death action arising out of the insured's fatal shooting of the brother and subsequent suicide. The trial court found that the injury inflicted was not expected or intended and therefore declared that Alabama Farm Bureau was obligated to defend and provide coverage to the insured's estate in the wrongful death action brought by his brother's widow. Alabama Farm Bureau appealed. The issues presented for review on appeal were:

(1) whether the ore tenus presumption of correctness applied to the trial court's ruling that the injury which Wayne Dyer inflicted upon his brother William was not "expected or intended from the standpoint of the insured";

(2) whether a subjective or objective standard governed the determination of whether the insured's infliction of bodily injury upon another was expected or intended;

and

(3) whether the trial court erred in determining that the insured Wayne Dyer neither expected or intended to injure his brother.

*Id.* at 923.

Upon review the *Dyer* court noted that the ore tenus presumption of correctness applied to the trial court's finding:

This court has consistently held that the question of whether an injury which the insured inflicts upon another is "expected or intended from the standpoint of the insured" is a question of fact for the jury or judge.

*Dyer,* 454 So.2d at 924.

Responding to the argument of the Farm Bureau that even under the ore tenus presumption the trial court's ruling on the applicability of this exclusion was clearly erroneous, palpably wrong, and manifestly unjust under the objective standard of review which declares that a "voluntary injury is intentionally doing some act which reasonable and ordinary prudence would pronounce dangerous" and to Farm Bureau's contention that because reasonable, ordinary prudence would certainly pro-

nounce the act of pulling the trigger of a gun aimed within point-blank range at another person "dangerous", the resulting injury to this person would therefore be "expected or intended from the standpoint of the insured," the Alabama Supreme Court in *Dyer* reexamined its past pronouncements interpreting this policy exclusion to determine whether a subjective or objective standard governed, *Id.* at 924–25. The *Dyer* court rejected the objective standard of review and "foreseeable injury" argument advanced by Farm Bureau and thereupon enunciated the proper standard to be applied when weighing the facts in cases involving the construction of this standard-form insurance policy exclusion, using the following language:

The "voluntary exposure to unnecessary danger" exclusion, however, denies coverage for the insured's bodily injury or property damage resulting from the insured's intentional exposure to a condition which the reasonable person would pronounce dangerous (footnote omitted), hence the need for an objective methodology, unlike the "expected or intended from the standpoint of the insured" exclusion, which denies coverage for another person's bodily injury or property damage which the insured either subjectively expected or intended to inflict upon another.

Because the presumption in tort and criminal law that a person intends the natural and probable consequences of his or her intentional acts has no application to the interpretation of the terms used in the "expected or intended from the standpoint of the insured" policy exclusion, the policy terms, "expected or intended injury," cannot be equated with "foreseeable injury." *See Smith v. North River Ins. Co.,* 360 So.2d 313, 315 (Ala.1978) (question of intent in personal injury action not the same as question of "expected or intended" injury in policy exclusion).

We therefore hold that a purely subjective standard governs the determination of whether the insured Wayne Dyer ei-

ther expected or intended to inflict bodily injury upon his brother, William. Under this subjective test, an injury is "intended from the standpoint of the insured" if the insured possessed the specific intent to cause bodily injury to another, whereas an injury is "expected from the standpoint of the insured" if the insured subjectively possessed a high degree of certainty that bodily injury to another would result from his or her act. *See Continental Western Ins. Co. v. Toal,* [309 Minn. 169], 244 N.W.2d 121, 125 (Minn. 1976), for a thorough discussion of the proper standard used to interpret this policy exclusion.

*Id.* at 925. Noting that the final issue presented for review was whether the trial court erred in determining that the insured Wayne Dyer neither expected nor intended to injure his brother, the *Dyer* court concluded:

Farm Bureau's position is predicated upon an objective interpretation of the policy terms "expected or intended from the standpoint of the insured." Because a purely subjective standard governs the construction of this clause, the record discloses ample evidence to support the trial court's ruling.

. . . .

Based upon all this evidence, the court could have reasonably concluded that Wayne neither expected nor intended that the gun would discharge and wound his brother.

We therefore affirm the judgment.

*Id.* at 926.

*Watson v. Ala. Farm Bureau Mut. Cas. Ins. Co,* 465 So.2d 394 (Ala., 1985), is the case next decided by the Supreme Court of

Alabama involving the same issues resolved in *Dyer* on June 1, 1984. In *Watson* the homeowner's insurer brought a declaratory judgment action to determine its obligation, if any, to defend and provide coverage to its insured in a pending assault and battery action. The trial court entered judgment declaring that Alabama Farm Bureau had no duty to defend or obligation to provide coverage to Watson. The insured appealed, raising two issues, only one of which is pertinent. That issue was: whether the trial court committed reversible error by finding that the shooting was "expected or intended from the standpoint of the insured." The Alabama Farm Bureau homeowner's policy issued to Watson contained the following exclusion: [15]

"1. Coverage E—Personal Liability and Coverage F—Medical Payments to Others do not apply to:

a. bodily injury or property damage which is expected or intended by the insured."

*Id.* at 396. The Alabama Supreme Court observed, *Id.* at 396, that it had considered this same standard form insurance policy exclusion in *Dyer,* [16] in an effort to determine whether an insured's shooting of his brother was "expected or intended from the standpoint of the insured." The *Watson* court succinctly stated the finding of the trial court in *Dyer* in favor of the insured and that upon review it had (in *Dyer*) noted that the ore tenus presumption of correctness applied to the trial court's finding. The *Watson* court thereupon quoted the following articulation by the *Dyer* court of the legal standard to be applied when weighing the facts:

"We, therefore, hold that a purely subjective standard governs the determination of whether the insured Wayne Dyer

15. The exclusionary clause in *Watson* is identical to the exclusionary clause in the instant case.

16. The Supreme Court slightly erred in making this statement. In *Dyer* the exclusion read: "This policy does not apply: (1) under Coverage E—Personal Liability ... (f) to bodily injury ... which is either expected or intended *from the standpoint of the insured.*" (emphasis supplied).

In *Watson* the exclusion clause read: "1. Coverage E—Personal Liability and Cover F—Medical Payments To Others do not apply to: (a) bodily injury ... *which is expected or intended by the insured.* (emphasis supplied). The latter exclusion clause is identical to the exclusion clause in this case. The Supreme Court of Alabama has apparently perceived no difference between these two exclusion clauses.

either expected or intended to inflict bodily injury upon his brother, William. Under this subjective test, an injury is intended from the standpoint of the insured if the insured possessed the specific intent to cause bodily injury to another, whereas, an injury is 'expected from the standpoint of the insured' if the insured subjectively possessed a high degree of certainty that bodily injury to another would result from his or her act."

*Dyer*, 454 So.2d at 925.

*Watson* then opines:

Applying the pronouncements in *Dyer* to the case at bar, the record indicates that there was sufficient evidence to support the trial court's findings. The testimony at trial indicates that Watson took a gun with him when he went to see what had happened to his daughter. Watson got out of his car and had the gun with him. He came up to Renfroe's truck and asked, "What ya'll done to Sharon?" and then pulled the gun, pointed it at Renfroe's head, and shot Renfroe.

Although the testimony indicated no prior animosity between the parties, and although Watson testified that he did not mean to shoot Renfroe, nevertheless the trial judge, after hearing all the evidence could have reasonably concluded that when Watson pulled the gun, he either expected or intended that the gun would discharge and injure Renfroe.

Based upon all of the evidence, the trial court could have reasonably concluded that Watson either expected or intended that the gun would discharge and injure Renfroe. The ore tenus presumption of correctness attached to the trial court's findings on this controverted factual question.

*Id.* at 396.

The *Watson* opinion next proceeds with a discussion of the issue whether the trial court erred in its finding that insured failed to give Farm Bureau notice of the incident within the time required by the policy, not here pertinent, and then affirms the judgment of the trial court:

Upon review of the record in this case, we find that the trial court's conclusions were not clearly erroneous or against the great weight of the evidence. Therefore, the judgment of the trial court is affirmed.

*Id.* at 397.

*Allstate Ins. Co. v. Shirah*, 466 So.2d 940 (Ala.1985), decided by the Supreme Court of Alabama on March 1, 1985, was an appeal from a declaratory judgment action brought by appellant, Allstate Insurance Company (Allstate), to determine the rights and liabilities of the parties under an automobile insurance policy issued by Allstate to appellee, Daniel L. Shirah. The policy contained the following provision:

EXCLUSIONS—What is not covered.

This coverage does not apply to liability for

(8) bodily injury or property damage caused intentionally by, or at the direction of, an insured person.

The trial court held that Allstate was required to defend Shirah against an action filed by Fred Fellows and Lynda Fellows and to pay all sums that Shirah might become obligated to pay under the terms of the policy.

The facts upon which the trial court's holding was based, insofar as here pertinent, are as follows:

On the night of April 26, 1982, Shirah went to a nightclub in Dothan, Alabama, and had several drinks. He left the club sometime after 10:30 p.m. Shortly before midnight, Officer Fred Williams of the Dothan Police Department observed a car slide to a stop in the left turn lane of Ross Clark Circle eastbound, where it intersects U.S. Highway 231. Officer Williams identified the driver of the car as Shirah. The car proceeded straight, instead of making a left turn, and accelerated rapidly. Officer Williams began pursuit and followed the car, which continued east on Ross Clark Circle. Officer Williams observed the car run a red light at the next intersection; cross over

into the westbound, on-coming lane of traffic and travel approximately 200 yards; enter a shopping center parking lot, make a 360–degree turn, exit the parking lot onto Denton Road, and proceed north.

In response to a radio dispatch originating with Officer Williams, Officer Ronald Black and Officer Fred Fellows began traveling south on Denton Road. Officer Black's unmarked police car was in the lead. Upon sighting the headlights of Shirah's car, Officer Black, in an attempt to establish a "rolling roadblock," wherein his car would be in front of Shirah's car and headed in the same direction, made a sharp turn to the left across the northbound lane of Denton Road. Unfortunately, Officer Black's car stalled during the turn and blocked the northbound lane. Officer Fellows, a short distance behind Officer Black, also began a turn; however, his car remained in the southbound lane. Shirah, upon reaching Officer Black's car, swerved his car into the southbound lane. Shirah avoided hitting Officer Black's car, but, collided with Officer Fellows's car. Officer Black testified that the time lapse between Shirah's passing his car and striking Officer Fellows's car was less than one second.

Subsequent to the accident, Officer Fellows and his wife Lynda filed an action against Shirah for damages for injuries sustained by Officer Fellows.

*Id.*, at p. 942. The *Shirah* court in affirming the judgment of the trial court observed that the Allstate standard form insurance policy exclusion above set out was analogous to the exclusion provision that was at issue in *Dyer* which excluded coverage for "bodily injury or property damage which is either expected or intended from the standpoint of the insured," that in *Dyer* the trial court under facts showing that the insured, Wayne Dyer, had shot and killed his brother William found that Wayne's shooting of his brother was neither "ex-

pected nor intended from the standpoint of the insured," that in affirming the findings of the trial court it (in *Dyer*) first noted that the question of whether an injury inflicted by the insured upon another person was expected or intended was a question of fact for the jury or judge and then held that a purely subjective standard governed the determination of whether the insured either expected or intended to inflict bodily injury, enunciating such standard. The *Shirah* court then wrote:

> Unlike *Dyer*, where the trial court had to determine whether the insured either expected or intended the injuries that occurred, in the instant case, because of the language of the exclusion provision, the trial court had only to determine whether Shirah intentionally caused the injuries suffered by Officer Fellows. Despite the circumstances preceding the accident, the record indicates that there was sufficient evidence to support the trial court's finding that Shirah did not intentionally cause "any bodily injury or property damage." ... The ore tenus presumption of correctness attached to the trial court's findings.
>
> On the basis of the foregoing analysis, the judgment of the trial court is hereby affirmed.

*Id.*, at p. 945.

The pronouncements in *Dyer* also were held controlling and determinative in *Allstate Ins. Co. v. Portis*, 472 So.2d 997 (Ala., 1985), which involved a declaratory judgment action brought by the homeowner's insurer against the defendant insured, Alexander Portis, and defendant Henry E. Coats, as administrator of the estate of John Coats, deceased, to determine the applicability of an exclusion [17] for bodily injury in the Allstate homeowner's insurance policy issued to Portis after a wrongful death action had been instituted by the defendant administrator against Portis arising from the fatal shooting of John

---

**17.** The exclusion clause in *Portis* provides:
"We do not cover bodily injury or property damage intentionally caused by an insured

person."

Coats by the defendant insured. The declaratory judgment action proceeded to trial before a jury. The jury returned a verdict for the defendant insured and against the plaintiff Allstate. The appeal followed.

The Supreme Court of Alabama in *Portis* affirmed its holding in *Dyer* that a purely subjective standard governed the determination of whether the insured either expected or intended to inflict bodily harm upon the victim (a question of fact for the judge or jury) and, applying that principle, held that the evidentiary record presented a conflict in the evidence which made it an issue for the jury on Portis's intent to cause injury. The judgment of the lower court against Allstate pursuant to the jury verdict was thereupon affirmed.

The most recently decided case of the Alabama Supreme Court involving a homeowner's policy exclusion identical to the homeowner's policy exclusion here and plainly presenting the same issues determined by the *Dyer, Portis* and *Watson* courts is *Holman v. Ala. Farm Bureau Mut. Cas. Ins.,* 476 So.2d 107 (Ala., 1985).

In *Holman* the insurer brought a declaratory judgment action seeking a declaration of rights under its homeowner's policy after its insured (as a member of the insured household) demanded that the insurer defend a tort suit against him.

The plaintiff Bruce Carlton in the tort suit against James Holman complained that he was assaulted, beaten, robbed and deprived of property by James Holman on the morning of August 21, 1983.

The trial court heard the evidence without a jury in the declaratory judgment action and entered judgment in favor of Farm Bureau denying the insured Holman a defense and coverage in the underlying tort action. The insured appealed. The Supreme Court stated the issue to be:

Is there sufficient evidence to support the trial court's judgment in favor of Farm Bureau?

The *Holman* court wrote to this above quoted issue, deciding that the trial court could reasonably have concluded that James Holman intended to cause bodily injury to Bruce Carlton and damage to Carlton's property and affirming the judgment of the trial court for the insurer, without citing its previous controlling decision in *Dyer,* or *Portis* or *Watson.* Neither did the *Holman* court enunciate in its opinion its recognition of the correct legal standard to be applied as pronounced in *Dyer, Portis* and *Watson* in weighing the facts shown by the record. These facts were stated to be as follows:

On the evening of August 20, 1983, at the Exit Inn, a bar in Tallapoosa County, Bruce Carlton shot three games of pool for money against James Holman. James won two games, but Carlton won the other. In the early morning, Carlton finally left the bar for home. James apparently left soon after.

While driving down the highway, James spotted Carlton's car. Turning to his passenger, Harold Dozier, who testified to these events at trial, James declared "that's that son of a bitch that took all my money from me." James followed Carlton. When he caught up to Carlton, he forced him to pull over.

When Carlton rolled down his window to speak to his follower, James, without warning, hit Carlton in the face with his fist. In the dark, Carlton could not recognize his attacker; Dozier testified that the attacker was James Holman.

James continued to strike Carlton in the face. After six or seven blows to the face, Carlton tried to protect himself by lying down in the car seat. Dozier testified James pulled a gun on him when he tried to help Carlton. James used the gun to strike a blow to Carlton's head. He then robbed Carlton, set fire to his car, and drove away.

*Id.* at p. 108.

The per curiam decision in *Holman* on the surface seems to rely on *Hartford Fire Ins. Co. v. Blakeney,* 340 So.2d 754 (Ala. 1976), a case discussed at length in *Dyer,* with observation by the *Dyer* court "that our most recent pronouncements interpreting this policy exclusion in *Smith v. North River Ins. Co.,* 360 So.2d 313 (Ala.1978),

and *Boyd v. Great Central Ins. Co.*, 401 So.2d 19 (Ala.1981), have repudiated the objective standard in *Blakeney* in favor of a purely subjective standard." *Dyer*, 454 So.2d at 924. However, in all fairness to the *Holman* decision, it should be noted that the court in *Holman* was not citing *Blakeney* as authority for the proper standard to be applied in determining the intent of the insured when construing a policy exclusion similar or the same as the policy exclusion involved in *Holman*. *Blakeney* was cited in *Holman* as authority for another, completely dissimilar, principle of law, shown by the following language in the *Holman* decision:

> Whether an exclusion like that in Holman's insurance policy, relating to "bodily injury or property damage which is expected or intended by the insured," has been violated is a question of fact, and not of law. *Hartford Fire Insurance Co. v. Blakeney*, 340 So.2d 754 (Ala. 1976). When the trial court is the factfinder, various presumptions of correctness control. Under the ore tenus rule, when the trial court hears disputed evidence presented ore tenus without a jury, its findings of fact are favored with a presumption of correctness and will not be disturbed on appeal unless clearly erroneous or unsupported by credible evidence under any reasonable aspect of that evidence. *Stallworth v. First National Bank of Mobile*, 432 So.2d 1222 (Ala.1983).

476 So.2d at 108.

The *Holman* court concluded its opinion in these words:

> We cannot say the trial court's judgment was clearly erroneous or unsupported by credible evidence. Based upon all this evidence, for the purpose of determining the applicability of the insurance policy exclusion, the trial court could reasonably have concluded that James Holman intended to cause bodily injury to Bruce Carlton and damage to Carlton's property.

*Id.* at p. 109.

This Court has been unable to determine the reason or rationale for the *Holman*

court's failure to provide the parties litigant and the bench and bar of Alabama with an explanation of the standard employed and applied by that court in determining that the lower court's declaratory judgment in favor of the insurer, Farm Bureau, was due to be affirmed. *Holman* did not purport to repudiate or overrule either *Dyer*, *Portis* or *Watson*. One can conclude from a reading and analysis of the decisions that *Holman* is remarkably similar to *Watson*. The inexplicable failure of *Holman* to include a statement therein that the court was bound by its past (and recent) pronouncements of the proper standard to be used to interpret the homeowner's policy exclusion there under consideration is simply a legal mystery, the solution for which can only be provided by that court.

Another Alabama Supreme Court opinion rendered on September 20, 1985 which reaffirmed the rationale, reasoning and pronouncements of *Dyer*, *Watson* and *North River Ins. Co.* is *U.S. Fidelity & Guar. Co. v. Armstrong*, 479 So.2d 1164 (Ala.1985), which construed a USF & G policy of general liability insurance providing in pertinent part:

> "The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
>
> A. bodily injury or
>
> B. property damges to which this insurance applies, caused by an occurrence."
>
> "Occurrence" is defined in the policy as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."

*U.S. Fidelity & Guar. Co. v. Armstrong*, 479 So.2d 1164, 1166–167. In *Armstrong*, the liability insurer filed a declaratory judgment action to determine insurance coverage for parties engaged in the construction of a sanitary sewer system. The

lower court found that USF & G was under a duty to defend in a suit brought by a landowner for damage caused by overflow of raw sewage and would be liable to pay, within the policy limits, any judgment rendered in that action. Testimony at trial indicated that the existing sewer line was intentionally crushed to allow work on a new sewage line to proceed below the existing line. The crushing blocked off the sewage, causing it to back up in the line and overflow through a manhole onto the property of the plaintiff in the property damage action. USF & G argued that all of the acts which caused the sewage overflow—and ultimately the alleged property damage—were intended and that the resulting overflow should have been expected. Thus, concluded USF & G, there was no "occurrence" to invoke policy coverage.

In disagreeing with the insurer's contentions and affirming the judgment of the trial court,[18] the *Armstrong* court stated:

> There is a presumption in tort law that a person intends the natural and probable consequences of his intentional acts. However, this presumption has no application to the interpretation of the terms used in the "neither expected nor intended from the standpoint of the insured" coverage clause and the policy term "expected or intended injury" cannot be equated with foreseeable injury. *Alabama Farm Bureau Mut. Cas. Ins. Co. v. Dyer*, 454 So.2d 921, 925 (Ala.1984); *Smith v. North River Ins. Co.*, 360 So.2d 313, 315 (Ala.1978). This Court has recently made it clear that the legal standard to determine whether the injury was either expected or intended within this context is a purely subjective standard. *Watson v. Alabama Farm Bureau Mut. Cas. Inc. Co. v. Dyer*, 454 So.2d 921, 925 (Ala.1984). The insured must have possessed specific intent to inflict the damage to activate this policy

exclusion. *Watson*, 465 So.2d at 396. *See also, Hearn v. Southern Life & Health Ins. Co.*, 454 So.2d 932, 934–35 (Ala.1984). There is no evidence on this appeal to suggest that the defendants specifically intended the discharge of raw sewage onto Ms. Armstrong's land.

A closely analogous case is that of *Moss v. Champion Ins. Co.*, 442 So.2d 26 (Ala.1983). In *Moss*, a roofer was sued for water damage which occurred while a roof was being replaced. This Court held that while the roof was indeed intentionally removed, the resulting water damage was not intended, and, therefore, that there was an "occurrence" within the general liability policy terms.

*Armstrong*, 479 So.2d at 1167.

This Court is fully persuaded that the pronouncements of the Supreme Court of Alabama in *Dyer, Watson, Shirah, Portis* and *Armstrong* hereinabove discussed govern the determination by this United States District Court of whether the insured, Edward McIntyre, either expected or intended to inflict bodily harm upon his minor granddaughter, Dawn Marie Yoder, when in a nonviolent way he sexually abused the child on one occasion in the McIntyre home in the summer of 1983 and again on another occasion approximately one year later at the same Alabama location. Moreover, this Court is bound by Alabama law to use and apply a purely subjective standard in making such determination from the evidentiary record in this declaratory judgment action. Under this subjective test, clearly and recently enunciated by Alabama's highest court in five recently reported decisions, *supra*, each involving an exclusion clause in a homeowner's insurance policy which is similar or the same as the exclusion clause in the McIntyre's homeowner's insurance policy hereinabove set out or analogous thereto, an injury is "intended

---

**18.** The Supreme Court of Alabama in *Armstrong* followed its consistent holding that the question of whether an injury which the insured inflicts upon another person is "expected or intended from the standpoint of the insured is a question of fact for the jury or judge, ruling that upon review of the record in the case we find that the trial court's judgment was not clearly erroneous or against the great weight of the evidence." *Id.* at 1169.

**1194**

from the standpoint of the insured" if the insured possessed the specific intent to cause bodily injury to another, whereas an injury is "expected from the standpoint of the insured" if the insured subjectively possessed a high degree of certainty that bodily injury to another would result from his or her act. Furthermore, the law is well settled in Alabama that the question of whether an injury which the insured inflicts upon another is "expected or intended from the standpoint of the insured" is a question of fact for the jury or judge, whichever is the trier of fact.

Applying the pronouncements of *Dyer* and its progeny to the case at bar, the Court concludes and finds after a careful review and analysis of the evidentiary record in this declaratory judgment action, aided by the Court's close observation of the demeanor of the defendant grandfather, the defendant minor child and her mother throughout the bench hearing and jury trial of the underlying tort action, that defendant Edward McIntyre had no specific intent to cause bodily harm to his minor granddaughter, Dawn Marie Yoder, when he sexually abused her in a nonviolent way on the two occasions in question nor did he subjectively possess at the time of such episodes, or either of them, a high degree of certainty that bodily injury to his minor granddaughter would result from his acts.[19] The Court's conclusion and finding of fact that Edward McIntyre neither expected nor intended that his nonviolent sexual abuse of his minor granddaughter would cause her bodily harm is buttressed by an absence of direct evidence in this record bearing on such issues (except proof of nonviolent sexual abuse), by the facts heretofore found and related in n. 11, *ante*, at pp. 1181–1182, by the reasonable inferences which the Court draws from the entire evidentiary record after hearing and seeing all of the witnesses testify firsthand, and by the fact that under applicable and binding Alabama case law the policy term "expected or intended by the insured" in this declaratory judgment action for an interpretation thereof cannot be equated with "foreseeable injury," *Dyer*, 454 So.2d at 925, because the presumption in tort and criminal law that a person intends the natural and probable consequences of his intentional acts has no application. *Id.*

### CONCLUSIONS OF LAW

The Court has subject matter jurisdiction of this declaratory judgment action by reason of diversity of citizenship and amount in controversy. 28 U.S.C. § 1332. Venue and personal jurisdiction are not contested. The remedy of declaratory judgment herein sought is authorized by 28 U.S.C. § 2201.

The beginning premise in arriving at a correct legal result in this case is a recognition and adherence to settled principles of Alabama law governing the construction and interpretation of insurance policies containing the "expected or intended from the standpoint of the insured" policy exclusion or the equivalent thereof, i.e., "bodily injury which is expected or intended by the insured," which is the policy exclusion in the instant case. The Court at pp. 1186–1189, *ante*, has discussed the Alabama cases which have clearly stated such principles. Its adherence to them in this case produces a result which is discomfiting.

Other cases in Alabama's sister jurisdictions have been faced with the precise or similar question now before the Court with a factual background of sexual abuse of a minor by an adult, sexual assault by an adult of a minor, sexual relations between an adult and a minor and nonconsensual

---

19. In making this finding the Court places no reliance whatever on the psychiatric testimony of Dr. Joseph Glaister that in March 1985 he diagnosed Edward McIntyre as suffering from pedophilia for the reason that there was no development of this psychiatric evidence following the diagnostic testimony from which the Court can make reasoned and rational findings with respect to the correlation of this grandfather's apparent sexual perversion in which children are his preferred sexual object with the

sexual contact with a disabled adult by a counselor, as will be seen from later discussion of those cases herein, with legal results different in some cases[20] from the result which would have been forthcoming had such foreign jurisdiction cases been decided under settled Alabama law. While the Supreme Court of Alabama has not addressed this precise question in the context of sexual abuse of a minor by an adult, or of alleged sexual acts between an adult and a minor of tender years, or of prohibited sexual relations between an adult and a minor child, the judge who is here sitting is thoroughly persuaded by his 31 years of trial and appellate practice in the Alabama courts as a private practitioner and by his 6 (plus) years of federal judicial experience sitting in the Northern District of Alabama that he can reasonably predict the opinion and holding of Alabama's highest court, when and if faced with this precise question of law in the context of the nonviolent type and content of sexual abuse by an adult of a minor of tender years and attendant facts as involved in the case at bar.

## BURDEN OF PROOF

■ In this declaratory judgment action by State Auto Mutual Insurance Company against its insureds, defendants Edward McIntyre and wife, Daisy McIntyre, and defendant Dawn Marie Yoder, 11–year old granddaughter of Edward McIntyre, to determine its obligation, if any, to defend and provide coverage to its insureds under the McIntyre's homeowner's insurance policy in an underlying personal injury action for damages brought by the minor granddaughter against her grandfather, Edward McIntyre, for and account of his assault of and battery to her person in the form of his sexual abuse of her on two separate occasions during the child's 1983 and 1984 summer visitations in the McIntyre home in Lauderdale County, Alabama, the burden of proof is properly placed on the plaintiff insurer to establish that its insured, Edward McIntyre, "expected" or "intended" to inflict bodily harm on his minor granddaughter by his acts of sexual abuse of her within the meaning of a policy exclusion in the State Auto Mutual homeowner's policy which provides in pertinent part: "*Coverage E—Personal Liability and Coverage F—Medical Payments To Others do not apply to: a. bodily injury or property damage which is expected or intended by the insured.*" *General Ins. Co. v. Killen,* 270 Ala. 604, 120 So.2d 887 (1960); *Alabama Farm Bureau Mut. Cas. Ins. Co. v. Cofield,* 274 Ala. 299, 148 So.2d 226 (1962); *Boyington v. American Liberty Ins. Co.,* 284 Ala. 581, 584, 226 So.2d 640 (1969); *State Farm Mut. Auto. Ins. Co. v. Boyer,* 357 So.2d 958 (Ala.1978). These cases have taken the position that the insurer who seeks a declaration of relief from the terms of a policy which it has issued bears the burden of proving its entitlement to that relief.

"intent" and "expectation" issues here under consideration.

**20.** A number of these sister jurisdiction cases apply the exclusion on the theory that an injury is "expected or intended from the standpoint of the insured" if a reason for the insured's act is to inflict bodily injury or

"when the character of the act is such that an intention to inflict an injury can be inferred as a matter of law."

*See, e.g., Continental Western Ins. Co. v. Toal,* 309 Minn. 169, 244 N.W.2d 121, 125 (1976), cited by *Dyer,* 454 So.2d at 925, for a thorough discussion of the proper standard (subjective) used to interpret the policy exclusion in the *Dyer* case which was substantially the same as in the Minnesota case. It is noted that the *Dyer* court did not adopt or quote with approval that portion of the Minnesota case holding that an intention to inflict an injury can be inferred as a matter of law based upon the character of the act which appears to be contrary to the repeated pronouncements of the Alabama Supreme Court that the question of whether an injury which the insured inflicts upon another person is "expected or intended from the standpoint of the insured" is a question of fact for the jury or judge, whichever is the trier of fact. *Boyd v. Great Central Ins. Co.,* 401 So.2d 19 (Ala.1981); *North River Ins. Co.,* 360 So.2d at 315–16; *Blakeney,* 340 So.2d at 755; *Dyer,* 454 So.2d at 924; *Watson,* 465 So.2d at 396; *Portis,* 472 So.2d at 1000; *Holman,* 476 So.2d at 108.

COURT'S ORDER OF AUGUST 25, 1986 THAT INSURER PROVIDE DEFENSE FOR INSUREDS IN UNDERLYING TORT ACTION (CV 86–HM–5237–NW) WITH FULL RESERVATION OF RIGHTS BY INSURER WITH RESPECT TO INDEMNIFICATION OF INSUREDS

Having consolidated the declaratory judgment action and the underlying tort action for trial by Pre-Trial Order entered August 25, 1986, the Court entered separate order on August 25, 1986 declaring that State Auto Mutual was to provide (and was directed to provide) legal defense for defendants Edward McIntyre and Daisy McIntyre in the underlying tort action (CV 86–HM–5237–NW) pursuant to the McIntyre defendants' homeowner's policy with full and express reservation of rights, however, by State Auto Mutual with respect to the issue of indemnification of such insureds by the insurer against liability for any judgment recovered by the minor plaintiff against the insureds in such tort action. State Farm Mutual consented to such order and in conformity therewith caused a defense to be provided its insureds in the underlying tort action. Hence the issue of the duty of this insurance company to defend its insureds in such tort action under the homeowner's insurance policy in question need not be actually decided in this case [21] although if the Court here determines that the insurer is obligated to indemnify its insured, Edward McIntyre, under it's homeowner's liability insurance policy with respect to the underlying sexual abuse tort action the duty to defend issue is also determined from a practical standpoint.

21. It is well established that the insurer's duty to defend is more extensive than its duty to pay. *Ladner & Co. Inc. v. Southern Guaranty Ins.*, 347 So.2d 100, 102–03 (Ala.1977); *U.S. Fidelity & Guar. Co. v. Armstrong*, 479 So.2d 1164, 1167 (Ala.1985). From the pre-trial conference in this case the Court concluded that the insured's duty to pay in the underlying tort action, if recovery was made by the minor plaintiff, could not feasibly be determined by the Court in the declaratory judgment action until all of the rele-

DISCUSSION OF *CONTINENTAL WESTERN INS. CO. V. TOAL*, 244 N.W.2d 121 (SUPREME COURT OF MINNESOTA 1976), CITED BY SUPREME COURT OF ALABAMA IN DYER, 454 So.2d at 925

■ A close reading and analysis of *Ala. Farm Bureau Mut. Cas. Ins. v. Dyer*, 454 So.2d 921 (Ala.1984), the seminal Alabama case on the proper construction of an intentional injury insurance policy exclusion, which invites the parties litigant and the bench and bar of Alabama to review *Continental Western Ins. Co. v. Toal*, 309 Minn. 169, 244 N.W.2d 121, 125 (1976), "for a thorough discussion of the proper standard used to interpret this policy exclusion," *Id.* at 925, and the acceptance of that invitation by reviewing and analyzing this cited Minnesota case, produces the reasoned conclusion that the *Dyer* court was substantially influenced by the rationale and reasoning of a particular part of the Supreme Court of Minnesota's *Continental Western Ins. v. Toal* decision hereinafter identified in determining whether a subjective or objective standard governs the interpretation of this policy exclusion by the courts of Alabama. While a reexamination of its *Blakeney* decision and progeny was clearly made in the decisional process which produced the *Dyer* decision by the Alabama Supreme Court, the citation by Alabama's highest appellate court of this Minnesota case and the particular page of that reported Minnesota decision, 244 N.W.2d at 125, "for a thorough discussion of the proper standard used to interpret this policy exclusion" (language of *Dyer*) and a consideration of the various principles and rules of law enunciated by the Supreme Court of Minnesota in that particular part of the decision, which

vant facts had been developed by full blown trial. The Court was not content to rule on the issues of duty to pay and duty to defend on the basis of the complaint for declaratory judgment. The research of the Court found no Alabama case interpreting the exclusion clause in question in the context of sexual abuse or a sexual offense akin thereto. The consolidation order was accordingly made a part of the Pre-Trial Order and the separate Order of August 25, 1986 followed.

reappear in *Dyer* with striking similarity, appears to confirm the Court's above stated conclusion. The following quotations from the Minnesota case are pertinent:

> The rationale underlying the general rule is that the insurance contract excludes only intended injuries and there is no need or public policy justification for expanding this exclusion through presumptions of intent. As the court in *American Ins. Co. v. Saulnier,* 242 F.Supp. 257, 261 (D.Conn.1965) stated:
>
> > "While the needs of a safe society for a civil remedy to satisfy an otherwise frustrated victim may be taken into account by courts in laying down a rule of law, the range of reference for the interpretation of language in an insurance policy, is the contract itself read in the light of the purpose of the parties entering into it."
>
> Thus the presumption in tort and criminal law that a person intends the natural and probable consequences of his intentional acts has no application to the interpretation of terms used in insurance contracts. *Vanguard Ins. Co. v. Cantrell,* 18 Ariz.App. 486, 503 P.2d 962 (1972); *Lumbermens Mutual Ins. Co. v. Blackburn,* 477 P.2d 62 (Okl.1970). Therefore, we conclude that the trial court's instruction in the instant case that the intentional injury exclusion precludes recovery for all injuries which are the natural and probable consequence of an insured's intentional act was inappropriate.

We have reached the same conclusion with respect to the trial court's instruction that, if the injury was a *foreseeable result* of an intentional act, is was an injury "expected from the standpoint of the insured." Defining "expected injury" as a foreseeable injury would have the effect of unduly limiting coverage under a liability insurance policy since foreseeability is generally an essential element in establishing liability. In *Grange Mutual Cas. Co. v. Thomas,* 301 So.2d 158 (Fla.App.1974), an insurance company attempted to persuade the court that an "expected" injury means an injury which "naturally and foreseeably flow[s] * * * from a wilful act." In rejecting such an interpretation, the court stated (301 So.2d 159):

> " * * * [I]f we were to give the exclusion before us the meaning argued by appellant, then, by a parity of reasoning, *we would have to exclude any injury from an unintentional tort* which a given jury might categorize as being 'expected' depending upon the degree of likelihood thereof under the facts and circumstances of the case. Conceivably, indeed, this might include an injury resulting from simple negligence and, under Florida law, could well include an injury resulting from gross negligence." (Italics supplied in part.)

Therefore, we conclude that an "expected injury," as that term is used in an insurance exclusionary clause, cannot be equated with foreseeable *injury.*[3]

---

3. Indeed those courts which have interpreted the "expected or intended" injury exclusion have construed the term "expected" to mean a "high degree of certainty." *State Farm Fire & Cas. Co. v. Muth,* 190 Neb. 272, 207 N.W.2d 364 (1973); *Vanguard Ins. Co. v. Cantrell,* 18 Ariz. App. 486, 503 P.2d 962 (1972).

244 N.W.2d at 125.

Immediately preceding this above quoted language, the Supreme Court of Minnesota noted its previous approval of the general rule that "it is the harm itself that must be intended before the exclusion will apply," citing 2 A.L.R.3rd 1238, 1241. It was this general rule to which the Minnesota court alluded in expressing the rule's underlying rationale in the first sentence above quoted. *Id.* at 124.

It seems equally clear that the *Dyer* court did not embrace nor adopt all of the rationale and reasoning of this cited Minnesota decision, particularly that part beginning at the lower right of p. 125 of 244 N.W.2d and continuing on p. 126 thereof which reads:

> Even though we have concluded that the trial court's instructions on the meaning of the "expected or intended" injury exclusion were incorrect, the insureds

are not entitled to a new trial. In *Caspersen v. Webber*, 298 Minn. 93, 99, 213 N.W.2d 327, 330 (1973), we indicated that an injury is "expected or intended" from the standpoint of the insured if a reason for an insured's act is to inflict bodily injury or "when the character of the act is such that an intention to inflict an injury can be inferred" as a matter of law. *See, Rankin v. Farmers Elev. Mutual Ins. Co.*, 393 F.2d 718 (10 Cir.1968). We find that the character of the insureds' acts in this case is such that an intention to inflict an injury can be inferred as a matter of law. This is not a case like *Caspersen* where an impulsive albeit intentional, act results in an unintended injury. The insured in *Caspersen* would never have pushed the hatcheck girl had he known before hand that it would result in a serious injury to her. In contrast, the facts in the instant case compel the conclusion that the insureds followed through with the armed robbery with knowledge that someone might well be injured or killed in the operation. The insureds knew that several of the participants would be carrying loaded guns. Ross had supplied two of these loaded guns and even instructed Toal that "all you got to do is pull the trigger." Toal had a reputation for being "good as a pistol man" and had practiced with a gun at a firing range before the robbery. In short, the insureds intentionally prepared themselves to inflict serious injury in order to facilitate the armed robbery. Thus, we find the insureds' acts to be of such a calculated and remorseless character that we infer an "intention to inflict an injury" as a matter of law. The trial court's order for declaratory judgment is therefore affirmed.

244 N.W.2d at pp. 125–26.

In the first place, if the Alabama Supreme Court had intended in *Dyer* to approve and adopt the rationale and reasoning of the last above quoted language of the Supreme Court of Minnesota it would have so stated plainly and clearly. It did not. Secondly, to adopt such rationale and reasoning the Alabama Supreme Court would have been required in *Dyer* to retreat from and abandon its consistently held rule that the question of whether an injury which the insured inflicts upon another person is "expected or intended from the standpoint of the insured" is a question of fact for the jury or judge. It did not. As a matter of fact, Alabama's highest appellate court in its *Dyer* decision repeated and readopted such rule, citing *Boyd v. Great Central Ins. Co.*, *North River Ins. Co.* and *Blakeney, supra*, as supportive authority therefor. Third, the approval and adoption of the rationale and reasoning of the above quoted language from the Minnesota decision by the Alabama Supreme Court in *Dyer* would have presented a direct conflict with its *Dyer* pronouncements: (1) that because the presumption in tort and criminal law that a person intends the natural and probable consequences of his or her intentional acts has no application of the terms used in the "expected or intended from the standpoint of the insured" policy exclusion, the policy term "expected or intended injury" cannot be equated with "foreseeable injury"; and (2) that a purely subjective standard governs the determination of whether the insured either expected or intended to inflict bodily harm upon another by his acts. *Dyer*, 454 So.2d at 925.

ALR4th ANNOTATIONS ON INTENTIONAL INJURY EXCLUSION CLAUSES AND RELATED SUBJECTS, HISTORY OF DEVELOPMENT OF INTENTIONAL INJURY EXCLUSION CLAUSES, AND CASES FROM ALABAMA'S SISTER JURISDICTIONS CONSTRUING INTENTIONAL INJURY EXCLUSION CLAUSES IN CONTEXT OF PROHIBITED SEXUAL CONDUCT

[ALR4th Annotations]

Before proceeding with a discussion of the cases decided by Alabama's sister jurisdictions which have construed or applied intentional injury exclusion clauses in liability insurance policies which are the same or similar to the exclusion clause in the

present State Auto Mutual homeowner's liability insurance policy, or analagous thereto, in a context of prohibited sexual conduct which prompted underlying tort actions or a threat thereof which in turn prompted declaratory judgment actions, the attention of counsel (and any reviewing court) is directed to the following ALR4th annotations: (1) "Construction And Application of Provision of Liability Insurance Policy Expressly Excluding Injuries Intended Or Expected By Insured," 31 ALR4th 957; "Liability Insurance: Intoxication or Other Mental Incapacity Avoiding Application of Clause In Liability Policy Specifically Exempting Coverage of Injury or Damage Caused Intentionally By Or At Direction of Insured," 33 ALR4th 983; "Acts In Self Defense As Within Provision of Liability Insurance Policy Expressly Including Coverage For Damages Or Injury Intended or Expected By The Insured," 34 ALR4th 761; "Criminal Conviction As Rendering Conduct For which Insured Convicted Within Provision of Liability Insurance Policy Expressly Excluding Coverage For Damage Or Injury Intended or Expected By Insured," 35 ALR4th 1063; and "Liability Insurance Coverage As Extending To Liability For Punitive Or Exemplary Damages," 16 ALR4th 11.

### [History of Intentional Injury Exclusionary Clause]

The history of the liability insurance industry's 1966 revision of the intentional injury exclusionary clause in policies affording a general coverage for liability is recounted in 31 ALR4th beginning at p. 971 [22] and is helpful to an understanding that development of the phrase "from the standpoint of the insured" as an essential part of the intentional injury exclusionary clause was designed to make plain that the revised clause was to be evaluated from the perspective of the insured rather than of the injured victim.

22. This ALR4th background discussion was taken from *Patrons-Oxford Mut. Ins. Co. v. Dodge*, 426 A.2d 888 (Maine 1981), a case not involving prohibited sexual conduct but involving the construction of an intentional injury exclusion

### [Cases From Sister Jurisdictions]

Other courts in Alabama's sister jurisdictions have been faced with the precise or similar issue before the Court in the instant case. The Minnesota courts have addressed this question at least four times.

In *Fireman's Fund Insurance Co. v. Hill*, 314 N.W.2d 834 (Minn.1982), the insurer brought a declaratory judgment action to determine whether certain sexual activities engaged in by its insured, James Hill, were covered under a home owner's policy which excluded "bodily injury or property damage which is either expected or intended from the standpoint of the insured." The trial court found that Fireman's Fund was obligated to defend James Hill in the civil action brought on behalf of the foster child and to pay all damages for which Hill might become liable. The insurance company appealed. The Supreme Court of Minnesota reversed.

The facts of this Minnesota case are as follows:

James Hill and his wife began taking foster children into their home in 1973. From that date until 1978, approximately ten children were placed in the home. In November of 1976, a minor male child went to live with the Hills. Prior to the child being placed there, the Hennepin County Welfare Department had received a complaint from the parents of one of the former foster children, alleging that Hill had molested the child. When he was confronted with the allegations Hill denied having any sexual contact with the foster child.

During the 15 months that the child was in the Hill home, James Hill engaged in sexual conduct with him. The child was removed from the foster home by the Welfare Department after Hill was arrested on charges of criminal sexual conduct with the other foster children. An action was commenced on behalf of

clause and holding that personal liability coverage did not apply "to bodily injury or property damage which is either expected or intended from the standpoint of the insured."

the boy by his mother and guardian against James Hill and Hennepin County for mental pain and anguish resulting from the assault by James Hill. During the time the boy was in the foster home, James Hill was insured under a homeowner's policy issued by the Fireman's Fund Insurance Company. Under the policy Fireman's agreed to pay, on behalf of the insured, all damages for which the insured became liable because of bodily injury or property damage caused by an occurrence. An occurrence was defined as an accident which results in bodily injury or property damage.

344 N.W.2d at 834–835.

The *Hill* court first observed that in interpreting intentional act exclusions in insurance policies it had held that it was not sufficient that the act was intentional. To be excluded from coverage, the Minnesota court noted, a person must have specifically intended to cause injury, although intent to injure would be found even if the actual injury is different in kind or more severe than that intended, citing *Iowa Kemper Ins. Co. v. Stone*, 269 N.W.2d 885 (Minn. 1978). The court further noted that in *Continental W. Ins. Co. v. Toal*, 309 Minn. 169, 244 N.W.2d 121 (1976), it stated:

> In *Caspersen v. Webber*, 298 Minn. 93, 99, 213 N.W.2d 327, 330 (1973), we indicated that an injury is "expected or intended" from the standpoint of the insured if a reason for an insured's act is to inflict bodily injury or "when the character of the act is such that an intention to inflict an injury can be inferred" as a matter of law. See, *Rankin v. Farmers Elev. Mutual Ins. Co.*, 393 F.2d 718 (10 Cir.1968).

*Id.* at 177, 244 N.W.2d at 125. (emphasis in original) *See Woida v. North Star Mutual Ins. Co.*, 306 N.W.2d 570 (Minn. 1981).

244 N.W.2d at 835.

The Supreme Court of Minnesota in the *Hill* case thereupon concluded:

> James Hill contends that he did not intend to harm the boy and that his actions were the result of his social and emotional immaturity. We find the nature of Hill's conduct was such that an intention to inflict injury can be inferred as a matter of law. The facts here indicate Hill intended to engage in sexual play and that he knew the welfare department would disapprove of his activities. Before the boy was placed in his home, he had been confronted by the department with allegations that he had sexually assaulted other foster children. He denied having had sexual contact with the children. He also knew the welfare department viewed his conduct as detrimental to the boy. The psychiatrist testified, in response to a hypothetical, that if James Hill had been confronted with and warned of his activities with other children before having contact with the boy, then he must have realized that his sexual play with him was not in the boy's best interest. These facts give rise to an inference of intent to inflict injury. Therefore, Hill's acts are excluded from coverage under the homeowner's policy.

244 N.W.2d at 835.

*Horace Mann Ins. Co. v. Independent School Dist. No. 656*, 355 N.W.2d 413 (Minn.1984) involved a male adult school teacher and counselor who engaged in repeated sexual contacts with a tenth-grade female student. Horace Mann Insurance Company (Horace Mann), the insurer of the Minnesota Education Association (MEA), brought a declaratory judgment action against Independent School District No. 656 (school district); its insurer, Fireman's Fund Insurance Company (Fireman's Fund); Michael Phillips (Phillips); his homeowner's insurer, Security Insurance Company (Security); and a father and his daughter, R.L.E., plaintiffs in a lawsuit commenced against the school district and Phillips, one of its teachers, claiming damages sustained by them as the result of alleged sexual contact by Phillips with R.L.E. in the course of his employment as a teacher with the school district (main action).

The trial court granted summary judgment to Horace Mann and Security, holding

that neither of them had the duty to defend or indemnify Phillips in the main action. The trial court denied the school district's and Fireman's Fund's initial partial summary judgment requesting orders that they had no duty to defend Phillips in the main action. Subsequent to these initial orders and judgment, the trial court entered orders denying amended motions brought by the guardian ad litem for R.L.E., Fireman's Fund and the school district. It also entered an order denying a second summary judgment motion alleging no duty to defend or indemnify brought by Fireman's Fund. The guardian ad litem, the school district and Fireman's Fund appealed. The Minnesota Supreme Court affirmed the orders and judgment granting Horace Mann and Security summary judgment and reversed the order denying Fireman's Fund summary judgment on the defense and indemnification issues. It held that the school district had the duty to defend Phillips but not to indemnify him in the main action.

The facts of the case were stated by the *Horace Mann* court to be:

Michael Phillips was employed by the school district. His duties included serving as assistant coach of the girls basketball team and as a chemical dependency counselor for the school system. During the 1978–79 school years, R.L.E. was a tenth and eleventh grade student in the school district and a member of the girls basketball team. At a school orientation session in fall 1978, the students in the high school had been informed that Phillips was available for information, counseling and discussions with respect to chemical use problems.

R.L.E. had a history of drug use beginning with the use of marijuana in the eighth grade. By the tenth grade, when she was on the girls basketball team, she also used "speed," hashish and alcohol. Phillips became aware of these chemical use problems and began advising and counseling R.L.E. R.L.E. alleged Phillips inflicted several sexual contacts upon her during her counseling with him and while she was on the basketball team.

After the last alleged contact, the girl began to exhibit emotional problems more severe then those previously experienced with her drug problems. Phillips initially recommended inpatient treatment to her parents, who consulted him, as her counselor, regarding her increased problems. Since 1979, she has experienced severe psychological illness and has required hospitalization on numerous occasions for suicidal tendencies, depression and anorexia. Her medical expenses, as of 1983, totaled approximately $90,000. the damage to R.L.E., allegedly arising out of the sexual contact incidents, prompted the filing of the main action in which R.L.E. and her guardian ad litem alleged strict liability and assault and battery against Phillips, a claim against the school district as his employer, and a claim against the school district for its own negligence in hiring and retaining Phillips in the position he held. Upon being sued, Phillips requested defense and indemnity from Horace Mann, Security, Fireman's Fund and the school district. Horace Mann then commenced the instant declaratory judgment action to determine its obligation, if any, to defend and indemnify Phillips. The other insurers and the school district likewise asserted claims of non-liability in this action.

355 N.W.2d at 415.

The Minnesota court in *Horace Mann* first considered whether the lower court erred in granting Horace Mann summary judgment. The court noted that as a member of the MEA, Phillips was an insured under the policy issued by Horace Mann to the association and observed that the trial court granted summary judgment to Horace Mann under an "intentional damages" exclusion in the policy, holding "that the nature of Phillips' conduct was such that an intention to inflict injury can be inferred as a matter of law" under the authority of *Fireman's Fund Insurance Co. v. Hill*, 314 N.W.2d 834 (Minn.1982), discussed, *ante.* The Minnesota opinion then proceeded to state the relevant provisions of the

Horace Mann liability policy issued to the MEA which defined OCCURRENCE, COVERAGES, EDUCATORS LIABILITY and EXCLUSIONS. Only exclusionary clause H under EXCLUSIONS needs to be set out here for the purpose of case analysis. Exclusionary clause H. INTENTIONAL DAMAGES reads:

> H. INTENTIONAL DAMAGES. Section III(A) of this policy does not apply to *occurrences* involving damages which are the intended consequence of action taken by or at the direction of the *insured.*

355 N.W.2d at 416. Appellants argued that the definition of "occurrence" in the Horace Mann policy was so broadly defined as "an event which results in damages" that intentional injuries were covered under the policy; and that the trial court erred by applying *Fireman's Fund Insurance Co. v. Hill,* 314 N.W.2d 834 (Minn. 1982), to the instant case because *Hill* was an interpretation of an "intentional injury" exclusion, whereas the Horace Mann exclusion excluded "intentional damages"; and that the "intentional damages" exclusion was ambiguous as to what it excluded so it should be construed in favor of coverage. Minnesota's highest appellate court, responding to these three arguments, stated:

> The first and third arguments are without merit if the exclusion for "intentional damages" is unambiguous. In *Hill* the exclusionary clause was for "intentional injury." We do not discern any material difference between that and "intentional damages." The words "damages" and "injuries" used in this context are synonymous. Black's Law Dictionary 706 (rev. 5th ed. 1979); (other citations omitted).

> Furthermore, the trial court's reliance on *Hill* was not misplaced. An intentional injury or damage exclusion excludes coverage in a liability policy either if "a reason for the act is to inflict bodily injury or when the character of the act is such that an intention to inflict an injury can be inferred." *Caspersen v. Webber,* 298 Minn. 93, 99, 214 N.W.2d 327, 330 (1973). Phillips, in a deposition, claimed

his actions were not intended to damage the girl. Thus, he did not subjectively intend to harm, although he intended to commit those sexual contacts to which he admits. Nevertheless, those subjective statements do not preclude this court from inferring an intent to injure or to damage from the nature of acts involved—unconsented sexual contact with a minor. *Hill,* 314 N.W.2d at 835; *see also Woida v. North Star Mutual Insurance Co.,* 306 N.W.2d 570 (Minn.1981); *Continental Western Insurance Co. v. Toal,* 309 Minn. 169, 244 N.W.2d 121 (1976). Accordingly, we conclude the trial court correctly held that the Horace Mann policy excluded coverage for defense costs and indemnity of Phillips as a matter of law.

355 N.W.2d at 416.

The remainder of the *Horace Mann* opinion deals with issues that have no relevance to the present discussion and for that reason is not here summarized. The order and judgment granting Horace Mann and Security summary judgment was affirmed. The order denying Fireman's Fund's second motion for summary judgment was reversed. The court ordered that summary judgment in favor of Fireman's Fund be entered on the issues of defense and indemnification of Phillips. It was further ordered that summary judgment be entered in favor of the school district adjudging it was not liable to indemnify Phillips for any of his acts. The order holding that the school district had the duty to defend Phillips was affirmed. The order denying the school district partial summary judgment on the issue of indemnification of Phillips was reversed.

The results were the same in a case involving nonconsensual sexual contact with a disabled adult by a counselor, *State Farm Fire & Casualty Co. v. Williams,* 355 N.W.2d 421 (Minn.1984), and repeated sexual assaults on a minor girl (from the time she was twelve until she was sixteen years of age) by her uncle, *Estate of Lehmann v. Metzger,* 355 N.W.2d 425 (Minn. 1984).

Similarly, in *CNA Ins. Co. v. McGinnis*, 282 Ark. 90, 666 S.W.2d 689 (1984), the insured sexually assaulted his stepdaughter and sought coverage under his homeowner's policy when he was sued. The Arkansas Court of Appeals allowed coverage since there was no direct evidence that McGinnis intended to inflict harm or damage upon his stepdaughter and Arkansas law did not apply the tort foreseeability concept in insurance cases. 10 Ark.App. 234, 663 S.W.2d 182 (1984). The Arkansas Supreme Court reversed. Noting that McGinnis had had "almost daily" sexual relations with his stepdaughter from the time she was six years old until she was sixteen, at which time he was arrested, the Court held that the test was "what a plain ordinary person would expect and intend to result from a mature man's deliberately debauching his six-year-old stepdaughter and continuing to do so for years." McGinnis' claim that he did not intend any injury flew "in the face of all reason, common sense and experience." 666 S.W.2d 690–691. The dissenting opinion agreed with the view expressed by the affirming judges in the Court of Appeals in this case that "the only way to find that he intended harm to result would be to find that harm was a natural and foreseeable consequence of his acts, and that approach was specifically rejected in Talley."

In *Rodriguez By Brennan v. Williams*, 42 Wash.App. 633, 713 P.2d 135 (1986) the Court of Appeals of Washington, Division 1, two cases were heard by consolidated appeal. In the first case the daughter through her guardian ad litem sought declaratory judgment that her stepfather's homeowner's policy provided coverage for damages resulting from the stepfather's incestuous relationship with her. The lower court rendered summary judgment in favor of the insurer and the daughter appealed. In the second case the insurer sought declaratory judgment that its policy did not apply to a claim against its insured for sexual contact with his 3–year old stepdaughter and his 1–year old daughter. The trial court denied the insurer's motion for summary judgment and the appellate court

granted discretionary review. The Washington Court of Appeals affirmed the lower court's ruling in the first case granting summary judgment to the insurer and remanded the second case to the trial court with directions to grant the insurer's motion for summary judgment, holding that mental and psychological injuries to a child are the ordinary consequences of a minor child being forced to engage in sexual activity with a parent and that acts of this nature were of such a character that an intention to inflict injury could be inferred as a matter of law, citing the Minnesota cases (previously discussed) of *Horace Mann Ins. Co. v. Independent School Dist. No. 656*, 355 N.W.2d 413, 416 (Minn. 1984), and *Fireman's Fund Ins. Co. v. Hill*, 314 N.W.2d 834, 835 (Minn.1982). Cited as contra was the New Hampshire case of *MacKinnon v. Hanover Ins. Co.*, 124 N.H. 456, 471 A.2d 1166, 1168 (1984), which is discussed, *infra*. Interestingly, the following quoted language from the intermediate Washington appellate court's decision reveals a recognition by that court that the law of the State of Alabama as enunciated in *Dyer* would not permit the results therein reached:

The argument is made that coverage is to be determined from the subjective intent of the individual insured. As seen, the interpretation of an insurance policy is to be made in accordance with the way it would be understood by the ordinary person buying insurance. *See also Ames v. Baker*, 68 Wash.2d 713, 415 P.2d 74 (1966).

Moreover, every purchaser of insurance can expect harm from such conduct. "Expected" means "more likely than not to occur." *Medina v. Transamerica Ins. Co.*, 37 Wash.App. 360, 365, 680 P.2d 69, *review denied*, 102 Wash.2d 1004 (1984). A child will more likely than not suffer mental and psychological injuries as a result of having sexual contact with his parent or step-parent. Thus, such injuries would be "expected" by an average, reasonable person. *See CNA Ins. Co. v. McGinnis*, 282 Ark. 90, 666 S.W.2d

689, 691 (1984); *Truck Ins. Exchange v. Pickering,* 642 S.W.2d 113, 116 (Mo.App. 1982); *but see Alabama Farm Bureau Mutual Casualty Ins. Co., Inc. v. Dyer,* 454 So.2d 921, 925 (Ala.1984); *Shook v. Tinny,* 122 Ill.App.3d 741, 78 Ill.Dec. 58, 461 N.E.2d 642, 645 (1984); *Patrons-Oxford Mutual Ins. Co. v. Dodge,* 426 A.2d 888, 891–92 (Me.1981). As a matter of law, Rodriguez's injuries were "expected" by Williams and Kelly's and Jessica's injuries were "expected" by Hoglund.

713 P.2d at 138.

A homeowner's insurer brought an action seeking a judgment declaring that its policy provided no coverage to its insured for his alleged sexual assaults against a minor in *Allstate Ins. Co. v. Kim W.,* 160 Cal.App.3d 326, 206 Cal.Rptr. 609 (Court of Appeal, First Dist., Div. 3 1984). The Superior Court of Solano County, California entered judgment on the pleadings in favor of the insurer. The insured and the minor appealed. In affirming the judgment the intermediate California appellate court held that an act which constitutes a violation of a Penal Code section prohibiting sexual assaults on a minor is a willful act within the meaning of the Insurance Code provision exonerating an insurer from liability for bodily injury or property damage intentionally caused by an insured. The rationale of this opinion is that under certain circumstances, the nature of the intentional act of the insured is such that an intent to cause at least some harm can be inferred as a matter of law.

Here the insured Korte was insured by Allstate under a homeowner's insurance policy which expressly excluded coverage for "bodily injury or property damage intentionally caused by an insured person." Allstate's action for declaratory relief was against both Korte (insured) and Kim W. (minor) seeking a declaration that the policy provided no coverage to Korte for the underlying tort action of Kim W. against Korte seeking compensatory and punitive damages resulting from sexual acts of sexual assault. Paragraph VI of Allstate's complaint alleged that during the years

1978 and 1979 Korte engaged in conduct with Kim W. and others, "assaulting and battering them for his own sexual gratification and in violation of Section 288 of the [California] Penal Code." Korte answered, admitting that in those years he "participated in such acts which constituted a violation of Penal Code No. 288" but denying, without explanation, the allegation that the policy afforded him no coverage.

Immediately prior to the commencement of the trial Allstate moved for judgment on the pleadings, relying in particular on Korte's admission of violating Penal Code section 288. The trial court granted the motion. The California appellate court noted that Allstate's motion for summary judgment on the pleadings was based both on the policy's exclusionary clause and on Insurance Code section 533 which provides that an insurer is not liable for a loss caused by a willful act of the insured, that Section 533 was a part of every insurance contract and was equivalent to an exclusionary clause in the policy itself, and that the public policy underlying section 533 was to prevent encouragement of a willful tort.

Answering the appellant's argument that they relied on cases which hold that even an act which is "intentional" or "willful" within the meaning of traditional tort principles does not necessarily exonerate an insurer from liability under Insurance Code section 533 if the resulting damage or injury is not intentional and is unexpected, the California Court of Appeal in *Kim W.* wrote:

> However, appellants cite no case applying this principle and obligating an insurer to pay for damages resulting from a willful sexual assault by its insured. (footnote omitted). In construing exclusionary clauses similar to that in this case, some courts have held that under certain circumstances, the nature of the intentional act of the insured is such that an intent to cause at least some harm can be inferred as a matter of law, and that as long as some harm is intended, it is immaterial that harm of a different mag-

nitude from that contemplated actually resulted. (See Annot., Liability Insurance—Wilful Injury (1965) 2 A.L.R.3d 1238, 1245–1246, and later cases (1983 pocket supp.) pp. 106–107). We conclude that an act which constitutes a violation of Penal Code section 288 is such an act. One who admits that his conduct violated section 288 has admitted (1) a lewd or lascivious act upon a part of the body (2) of a child under the age of 14 (3) with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of either the perpetrator or the child. (*People v. Nothnagel* (1960) 187 Cal.App.2d 219, 225, 9 Cal.Rptr. 519). Section 288 is intended not just to punish individuals for violating the moral standards of the community, but also to protect infants and children from lewd and lascivious assaults. (*People v. Meacham* (1984) 152 Cal.App.3d 142, 156, 199 Cal. Rptr. 586; *People v. Gutierrez* (1978) 80 Cal.App.3d 829, 834–836, 145 Cal.Rptr. 823; *People v. Toliver* (1969) 270 Cal. App.2d 492, 496, 75 Cal.Rptr. 819; *People v. Hobbs* (1952) 109 Cal.App.2d 189, 192, 240 P.2d 411.) Implicit in the determination that children must be protected from such acts is a determination that at least some harm is inherent in and inevitably results from those acts. As the court stated in *People v. Austin* (1980) 111 Cal.App.3d 110, 168 Cal.Rptr. 401, "Significant harm may occur to a child who is caused to engage in or submit to the lustful intendments of a person seeking sexual self-gratification. The range of proscribed potentially harmful acts is limited only by the imagination of the perpetrator. The harm may be manifested in many different mental, emotional and physical ways, leaving a child with possible lasting and debilitating fears." (*Id.*, at pp. 114–115, 168 Cal.Rptr. 401.) Accordingly, we conclude that an act which is a violation of Penal Code section 288 is a willful act within the meaning of Insurance Code section 533. (footnote omitted)

206 Cal.Rptr. at 613. The *Kim W.* court in n. 2 at 613 observed that a contention similar to that raised by appellants was rejected in *Fireman's Fund Ins. Co. v. Hill*, 314 N.W.2d 834 (Minn.1982), a case previously discussed, *ante.*

The case of *Terrio v. McDonough*, 16 Mass.App. 163, 450 N.E.2d 190 (1983), involved an action wherein the plaintiff Terrio sued McDonough for sexual assault and battery and assault and battery. Terrio's complaint alleged that McDonough forced her to submit against her will to sexual intercourse and unnatural acts and that he committed assault and battery upon her. A jury returned a verdict for $15,000 for the plaintiff. The defendant impleaded his homeowner's insurance carrier and the trial judge directed a verdict for the insurer, Hartford Fire Insurance Company, on the plaintiff's opening. Defendant appealed.

McDonough's policy disclaimed personal liability for "bodily injury ... which is either expected or intended from the standpoint of the insured." An outline of the facts of this case appears in the opinion, 450 N.E.2d at 192:

Rosanna Terrio, the plaintiff, had a brief love affair with McDonough in May, 1977. On March 14, 1979, in the late afternoon, Terrio was driving past where McDonough lived and, on impulse, dropped in to see him. McDonough had just showered and answered the door clad in a bathrobe. After some conversation McDonough expressed his regret that he had nothing to offer for a drink. Terrio went to a nearby liquor store and returned to McDonough's apartment with a bottle of whiskey. The two shared several drinks and talked some more about old times.

Sexual intercourse followed, and the attendant circumstances are a subject which the parties sharply dispute. McDonough's testimony describes a consensual rekindling of the extinguished passion; Terrio's account, described a rape. Following the sexual episode, Terrio left McDonough's apartment, which was on the second floor level of a two-family house. Terrio was scarcely out of the building when she realized she had for-

gotten her purse and shawl and went back up the stairs to retrieve them. In the course of that errand she talked over the telephone with McDonough's fiancee, again in circumstances which are disputed. Terrio said an angry and violent McDonough demanded that she speak with his fiancee; McDonough describes the conversation as the act of a drugged (he testified that Terrio had dosed herself with valium), drunken and malicious woman wishing to make trouble for him.

Thereafter, Terrio tumbled down the stairs and crashed through a glass panel in an exterior door at the bottom of the stairs. McDonough testified that Terrio fell; Terrio said she was pushed.

Terrio suffered two lacerations which required sutures, one on her thumb and one in the right temporal area. Examination at the Newton-Wellesley Hospital, to which McDonough took her, disclosed additional glass wounds on her lower legs and bruises on her arms and upper buttock.

The Massachusetts Appeals Court held that the insurer had no obligation to defend Terrio's personal injury suit against McDonough for damages where the complaint alleged intentional conduct on the part of the defendant, not negligence, and the policy excluded intentional conduct from coverage.

*State Farm Fire & Cas. v. Reuter*, 299 Or. 155, 700 P.2d 236 (1985), involved a proceeding which was instituted by an insurer to obtain a declaratory judgment as to whether the victim of a sexual assault committed by the insured's son was collaterally estopped from claiming coverage under the insured's homeowner's insurance policy. The Oregon trial court entered summary judgment for the insurer and the victim appealed. The decision of the Oregon Court of Appeals reversed the judgment of the trial court. The Court of Appeals' judgment was in turn reversed by the Oregon Supreme Court and the case was remanded. On remand the Court of Appeals reversed and the insurer's petition for review was granted. The Oregon Su-

preme Court held that the victim of the sexual assault committed by the insured's son was collaterally estopped from claiming coverage under the homeowner's policy because of the conviction of sexual assault sustained by the insured's son in an earlier criminal action where the conviction necessarily meant that the insured's son either expected or intended to injure his victim, a condition which excluded the son from coverage under the policy. This Oregon decision further held that the victim was in privity with the son because of the relationship which arose from her status as a claimant and potential judgment creditor. The decision of the Court of Appeals was reversed and the judgment of the trial court affirmed.

The facts of this Oregon case are not in dispute. Reuter, the son, was charged by indictment with rape of Gail Theresa Bullen in the first degree. Reuter pleaded not responsible by reason of mental disease or defect. The jury rejected this defense and found Reuter guilty as charged.

At the time of the rape, Reuter (presumably as a member of the household of the named insured) had a policy of liability insurance with State Farm which contained this exclusion: "This policy does not apply ... to bodily injury or property damage which is either expected or intended from the standpoint of the insured ..."

Following the criminal conviction Gail Theresa Bullen brought a damage action against Reuter, alleging that Reuter's conduct occurred while he was "suffering from a mental disorder which ... caused [Reuter] to be unable to conform his conduct to the requirements of law." State Farm then filed the declaratory judgment action naming Reuter and Bullen as defendants, seeking a declaration of its obligations. Reuter made no appearance. State Farm's motion for summary judgment alleged that on or about August 9, 1977 Reuter raped Gail Theresa Bullen, was found guilty of first degree rape as a result of such incident by a jury after full trial on all issues, that in such criminal proceeding the defense of diminished men-

tal capacity was actually raised and fully adjudicated by Reuter, that the jury by its guilty verdict rejected such defense and that State Farm contended that its homeowner's policy did not provide insurance coverage for anyone as a result of the rape incident.

The Supreme Court of Oregon noted by way of footnote (n. 3, p. 239) that State Farm had the burden of proving the applicability of its exclusion. Observing that the jury found beyond a reasonable doubt that Reuter "did unlawfully and knowingly, by forcible compulsion, engage in sexual intercourse ... with Bullen," the *Reuter* court stated that the question then becomes: Is an attack that was "knowingly" committed "expected or intended from the standpoint of the insured"? The answer to this question was provided by the following language:

> The Court of Appeals held that the exclusion was applicable because "[a]n attack that was 'knowingly' committed must be, under the policy 'either expected or intended' from the standpoint of the insured." 68 Or.App. at 20, 680 P.2d at 1001–02. Bullen has not sought review of this holding (footnote omitted). Therefore, for the purposes of this appeal, we will consider a conviction of knowingly committing first degree rape necessarily to mean that the rapist either expects or intends to injure the victim. With that assumption, coverage is excluded under the instant policy. (footnote omitted).

Since Bullen was not in privity with the state because she "lacked sufficient control of Reuter's prosecution," 700 P.2d at 239, n. 5, the Oregon Supreme Court was faced with the third and final question in the case: Was Bullen in privity with Reuter? First examining whether Reuter, the insured, was collaterally estopped by the finding in the criminal case and concluding that Reuter's conviction in the criminal case "conclusively established" that the injury was "knowingly" committed, the *Reuter* court held that claimant Bullen was similarly barred because of her legal relationship to Reuter—a relationship which arose from her status as a claimant and potential judgment creditor of Reuter. Reasoning that if Bullen obtained judgment against Reuter under the allegations of her complaint, two avenues against State Farm would be open to her, garnishment of State Farm or suing State Farm under a cited Oregon statute which gave a claimant who obtained judgment against an insured a direct right of action against the insurer, the Oregon Supreme Court noted that a garnishment under Oregon law gave the judgment creditor plaintiff no greater rights against the garnishee than the judgment debtor had and that statutes like the Oregon statute which permitted third party beneficiary actions by judgment creditors of insured tort-feasors were held to give the injured plaintiff the same, but not necessarily greater, rights than the insured had under his contract, citing Oregon case law to that effect. In either case, held the *Reuter* court, the finding in the criminal proceeding precluded an inconsistent finding in Bullen's case before the court. Pointing to the derivative nature of Bullen's claim and her status as a judgment creditor of Reuter if she prevailed on her tort claim against Reuter, the Oregon court pronounced that within that status, Bullen was subject to the claims or defenses that the insurer had against the one from whom she derived that claim and announced that with the finding in the criminal case, Reuter became subject to the collateral estoppel claim that State Farm asserted with result that Bullen's derivative status collaterally estopped her. Status, not control, said the *Reuter* court, is the determinative factor when the claim is by a successor in interest.

In *Linebaugh v. Berdish*, 144 Mich.App. 750, 376 N.W.2d 400 (1985), a man, who had been sued by a woman for damages she allegedly sustained because of injuries allegedly resulting from sexual contact between them when he was 21 and she was 14 years of age, brought an action against the woman and his insurer, seeking declaratory judgment requiring indemnification under his parents' homeowner's policy for

any judgment recovered against him in the woman's action and seeking to compel his insurer to defend him in that action. On cross-motions for summary judgment by the alleged perpetrator and the insurer, the trial court granted summary judgment for the insurer. The alleged victim and alleged perpetrator cross-appealed. The Court of Appeals of Michigan held that: (1) the intentional injury exclusion in the homeowner's policy applied; and (2) the insurer had no duty to defend.

The Michigan Court of Appeals noted that the first issue for its consideration in the appeal was whether an intent to injure could be inferred as a matter of law from the nature of Linebaugh's (the insured man) alleged sexual contacts with Berdish (the alleged woman victim). The court wrote to this question as follows:

> In this case, the central issue is whether Linebaugh, then twenty-one years old, intended to injure Berdish, then fourteen, when he allegedly had sexual intercourse with her. Unless the intent to injure can be inferred as a matter of law, a genuine issue of fact regarding Linebaugh's intentions remains and summary judgment under this rule would be improper. Thus, if we decide that intent to injure can be inferred, as a matter of law, summary judgment was proper because coverage under the policy in question excludes intentional injuries.

. . . .

The cases in Michigan concerning exclusions from homeowner's insurance coverage have generally construed one of two policy forms. Many older cases, in particular, have concerned exclusions for "injury, sickness, disease, death, or destruction caused intentionally by or at the direction of the insured", which is approximately the wording of the policy in this case.

The homeowner's policy issued by Transamerica to Linebaugh's parents provides that Transamerica will indemnify its insureds against "occurrences" which are accidentally caused. The policy states in part:

> "Section II. Comprehensive Personal Liability, definition
>
> \* \* \* \* \* \*
>
> "(b) Occurrence. 'Occurrence' means an accident, or a continuous or repeated exposure to conditions, which results in injury during the Policy Period, provided the injury is accidentally caused. All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence.
>
> \* \* \* \* \* \*
>
> "Section II of this Policy Does Not Apply:
>
> "(c) Under coverages E and F, to injury, sickness, diseases, death or destruction caused intentionally by or at the direction of the Insured."

The other line of Michigan cases interprets exclusions for some type of "bodily injury which is expected or intended from the standpoint of the insured". The type of insurance coverage being construed in a particular case should be constantly borne in mind. See generally, Anno: *Construction and Application of Provision of Liability Insurance Policy Expressly Excluding Injuries Intended or Expected by Insured,* 31 ALR4th 957, 971–976.

The general rule appears to be that the exclusion found in the instant case, to be effective, requires both an intentional act and an intentionally caused injury. *Putman v. Zeluff,* 372 Mich. 553, 557, 127 N.W.2d 374 (1964); *Morrill v. Gallagher,* 370 Mich. 578, 588, 122 N.W.2d 687 (1963) (firecracker intentionally thrown but injury was not intentional). This also appears to be the general rule in cases involving exclusions for injuries intended or expected by the insured. *Morelli, supra,* 111 Mich.App. p. 514, 314 N.W.2d 672. The central issue in the instant case focuses on whether there remains a question of fact as to Linebaugh's intention to injure or whether intent to injure

may be inferred here as a matter of law from the facts of the case because a twenty-one-year-old man allegedly had sex with a fourteen-year-old-girl.

376 N.W.2d at 402. The Michigan court observed that a preliminary discussion of the cases dealing with intent was necessary. Next follows a discussion of several cases previously decided by Michigan appellate courts wherein insurance coverage had been excluded for intentional acts. None of the Michigan cases discussed in this opinion dealt with an intentional injury policy exclusion in the context of sexual abuse, sexual molestation or prohibited sexual conduct.

At p. 404 of 376 N.W.2d is found the following written dialogue of the Michigan Court of Appeals wherein the court states the remaining question to be answered:

Assuming arguendo that Linebaugh intended no injury to Berdish, the question remains whether some actions, such as sex with a minor, statutorily defined, carries such a certainty of injury that intent to harm may be inferred as a matter of law for insurance cases. The precise situation involved here has not been addressed in a published opinion by a Michigan court.

Noting that other courts in Michigan's sister jurisdictions had been faced with the precise question left unaddressed by the appellate courts of Michigan, this intermediate Michigan appellate court proceeded to a review and analysis of the four Minnesota decisions previously discussed herein, the Arkansas case of *CNA Ins. Co. v. McInnis* and the California case of *Allstate Ins. Co. v. Kim W., supra,* all of which inferred an intent to harm as a matter of law and held there was no coverage under the intentional injury exclusionary clause there involved. Next reviewed and analyzed was the New Hampshire case of *MacKinnon v. Hanover Ins. Co.,* 124 N.H. 456, 471 A.2d 1166 (1984), which allowed coverage to an insured in a factual setting where the insured sexually abused his 6–year old granddaughter (a case hereinafter reviewed). Finding the law in Minnesota,

California and Arkansas to be the far better view, the Michigan Court of Appeals in this above cited case stated the applicable law of Michigan in the prohibited sexual encounter context to be as follows:

It is a difficult case when the alleged sexual acts appear entirely consensual, as in the instant case, with the exception that *one* party is legally unable to consent because of her age. The Legislature, however, in making Linebaugh's alleged acts a crime certainly perceived that harm results to underaged persons engaging in sexual intercourse. One likely harm the Legislature sought to prevent by passing the criminal sexual conduct code, specifically M.C.L. § 750.-520d; M.S.A. § 28.788(4) (third degree criminal sexual conduct), is severe emotional injury to naive fourteen year olds barely beginning to adjust to the changes wrought by puberty. Under M.C.L. § 750.520d(1)(a); M.S.A. § 28.788(4)(1)(a) it is a crime to engage in sexual penetration with a person at least 13 years of age and under 16 years of age.

We also point out "that a charge of statutory rape or criminal sexual conduct is made out by evidence of penetration of a female [male] under the statutory age without regard to her [his] consent. * * The law traditionally has held that the consent of a person of such tender years to such acts will not be recognized and accordingly that consent to no defense to such a charge." *People v. Worrell,* 417 Mich. 617, 621, 340 N.W.2d 612 (1983). It is our opinion that engaging in sexual penetration with an under-age female would be an act intended by Linebaugh (intentional act) and the intent to injure or harm can be inferred as a matter of law from the alleged sexual penetration of said child. Thus, the exclusion in the insurance policy applies to the facts in the instant case.

376 N.W.2d at 405.

*MacKinnon v. Hanover Ins. Co.,* 124 N.H. 456, 471 A.2d 1166 (1984), represents the only decision in Alabama's sister jurisdictions which has considered an intentional

**1210**

injury policy exclusion in a homeowner's insurance policy in the context of an underlying tort action for damages against the insured for sexual abuse of a minor by an insured and which has declined to modify in such situation the usual rules of construction in cases of insurance contracts by injecting concepts of substantive tort law into the process.[23]

In this New Hampshire appeal, the interlocutory transfer without ruling from the trial court arose out of an action for declaratory judgment to determine coverage under a homeowner's liability insurance policy. In an underlying tort action, the intervenor, Kimberly A. MacKinnon, on behalf of her daughter, claimed liability against the plaintiff, James F. MacKinnon, on theories of battery and negligent infliction of emotional distress, arising from alleged acts of sexual abuse by the plaintiff against his 6–year old stepdaughter. The defendant, Hanover Insurance Company, disclaimed coverage for liability on either theory, under a policy exclusion for "bodily injury ... which is expected or intended by the insured" (exclusion identical to exclusion in present case). For the purpose of interpreting and applying this exclusion, the superior court transferred two questions which in effect asked (1) whether the intention or expectation on which the exclusion turned was the actual intention or expectation of the insured with respect to bodily injury and (2) whether evidence of the insured's intoxication was admissible in determining such intention or expectation.

In answering "yes" to both questions the Supreme Court of New Hampshire first wrote in answer to the first question:

The first question is about interpretation. On its face, the quoted language does not present any need for interpretation. The meaning of the language is plain, and the common meaning of the language governs. *Baker v. McCarthy*, 122 N.H. 171, 175, 443 A.2d 138, 140 (1982). There is no indication that "bodily injury ... expected or intended by the insured" refers to anything other than

actual expectation or intention, as to the bodily injury, in the mind of the insured at the time he took the action allegedly resulting in injury. We hold that the exclusion refers to such actual expectation or intention.

Essentially three objections to this conclusion have been raised. The first rests upon the authority of cases construing "injury" to mean any injury resulting from an act intended or expected to injure. This interpretation would broaden the exclusion, since it would not limit coverage by reference to the particular injury intended. The present policy is not open to such an interpretation for the simple reason that the exclusion speaks of "bodily injury ... expected or intended by the insured," not of bodily injury resulting from an act expected or intended by the insured to injure.

Moreover, the cases cited in support of the broader exclusion characteristically are cases construing an exclusion relating to "bodily injury intended or expected from the standpoint of the insured." *E.g., Smith v. Senst*, 313 N.W.2d 202 (Minn.1981), *Steinmetz v. National American Ins. Co.*, 121 Ariz. 268, 589 P.2d 911 (App.1979). The criterion of the insured's standpoint was apparently adopted to reverse the judicial practice of determining coverage for accidental injury by reference to the expectations of the victim, rather than those of the insured. *See Patrons-Oxford Mut. Ins. Co. v. Dodge*, 426 A.2d 888, 890–91 (Me.1981). But a reference to intention or expectation from the insured's "standpoint" does, or may do, more. Such an exclusion may be construed to introduce what has been called an "objective normative" standard of intent or expectation. Such at least would allow for the possibility of the broader reading of the exclusion for which the defendant argues. A reference to intention or expectation "by" the insured does not allow for such a construction. The cases turning on "standpoint" are thus inapposite. We note also

**23.** That is, insofar as the research of this Court has disclosed.

that even the "standpoint" cases do not necessarily support the defendant's view. *Id.* at 891.

471 A.2d at 1167.

New Hampshire's highest appellate court next turned to its response to the second objection to its answer to the first question:

The second objection to our conclusion is that some acts are so nearly certain to produce injury that intent or expectation to injure should be inferred as a matter of law, so as to exclude coverage. The principal weakness of this position is that the policy language could have provided for this expressly, but did not. The principal strength of this position rests on a dictum in *Vittum v. N.H. Ins. Co.*, 117 N.H. 1, 4, 369 A.2d 184, 186–87 (1977). That opinion construed an exclusion tied to "injuries intentionally caused." *Id.* at 4, 369 A.2d at 186. While we noted that the trial court had found the insured had in fact intended the injury in question, we also responded to an argument of the insured by observing that the Restatement (Second) of Torts § 8A, regarded intended consequences as including those which the actor knows are "substantially certain" to result from an act, even if not actually desired. *Id.*

On reflection, we decline to modify the usual rules of construction in cases of insurance contracts by injecting concepts of substantive tort law into the process. We are not here concerned with the policy of the law of torts, any more than we were concerned in *Vittum* with "some remedial legislative goal." *Id.* We note, too, that in the present case *Vittum* is of limited precedential value because the court was not concerned with "injury ... expected or intended," but with "injuries intentionally caused." The language at issue in *Vittum* is at least open to the construction that intentionality refers to the act of causation, but not necessarily to the particular injury resulting. Sound or not, such a reading does not naturally fit the language before us.

471 A.2d at 1168.

The New Hampshire court then proceeded with a statement of its position with respect to the third objection to the answer provided by it to the first question:

We next reach the third objection, that the application of rules of public policy should preclude coverage in this case. Since the acts pleaded in the declaration are acts of assault, of a sexual nature, the defendant argues that an insured should not be indemnified against liability for their consequences. In essence, the defendant's position is that public policy precludes coverage for all consequences of intentional acts of harm. We find, on the contrary, that existing case law in this State is no barrier to finding the coverage claimed by the plaintiff.

In *American Home Assurance Co. v. Fish*, 122 N.H. 711, 451 A.2d 358 (1982), we overruled *Commercial Union Assurance Cos. v. Town of Derry*, 118 N.H. 469, 387 A.2d 1171 (1978), to the extent the latter case held public policy precluded coverage in cases of intentional torts. We observed that public policy favored rather than precluded coverage for liability arising directly against the insured from intentional torts such as false arrest, slander and subjects of actions under 42 U.S.C. 1983. *Id.* at 715, 451 A.2d at 360. Defendants have not provided us with any reason in principle to apply a different rule of public policy when liability is claimed to arise from acts of sexual assault, and we know of none.

471 A.2d at 1168.

The Supreme Court of New Hampshire's recorded answer in this cited case to the second question transferred from the lower court reads:

The second question transferred asks whether evidence of intoxication is admissible on the issues of intent and expectation under the exclusion clause. The defendant argues that it is not, citing two cases for the proposition that evidence that the insured "was under the influence of intoxicants and marijuana is of no consequence, for the law must not permit the use of such stimuli to become a defense for one's actions." *Hanover*

Ins. Co. v. Newcomer, 585 S.W.2d 285, 289 (Mo.App.1979); Travelers Ins. Co. v. Cole, 631 S.W.2d 661, 664 (Mo.App.1982).

We find these cases unpersuasive for two reasons. They speak of policies that should govern liability in tort, whereas in those cases, and in this one, the issue is one of coverage under a contract of insurance. Moreover, in each of those cases cited the courts were interpreting an exclusionary clause that turned on intent or expectation "from the standpoint of the insured," and in each case the court had adopted a rule that from certain acts intent should be inferred as a matter of law. Against this legally required inference, the courts held intoxication unavailing. In the present case, we deal with different operative language and have adopted the different standard of intent or expectation in fact. The cases cited are, therefore, not on point.

While public policy applicable to the criminal law does not automatically apply in a civil context, Burd v. Sussex Mutual Ins. Co., 56 N.J. 383, 399, 267 A.2d 7, 15 (1970), we note that for the purpose of determining the existence of the mental element on which criminal liability may depend, evidence of intoxication is admissible. RSA 626:4. While the exclusion in question reflects the assumption that coverage would weaken the deterrrent fear of liability, it is not obvious that a refusal to consider relevant evidence of intoxication on the issue of actual intent would have any appreciable effect on the behavior of insured persons. Hence, we find no reason in public policy to narrow coverage by holding evidence of intoxication inadmissible in the absence of a policy provision to that effect. See, e.g., Burd v. Sussex Mutual Ins. Co. supra; Nettles v. Evans, 303 So.2d 306 (La.App. 1974).

We emphasize that our answer to each question seeks to give effect to the plain meaning of an insurance contract. These answers do not imply that the contract could not have been different, and they do not imply anything about the court's views on the substantive law of torts.

471 A.2d 1168–1169.

DISCUSSION OF CASES CITED
BY INSURER

Counsel for State Auto Mutual in posttrial letter brief has cited Selected Risks Ins. Co. v. Bruno, 718 F.2d 67 (3rd Cir. 1983); Allstate Ins. Co. v. Simms, 597 F.Supp. 64 (D.Oregon, 1984); and Allstate Ins. Co. v. Sherrill, 566 F.Supp. 1286 (E.D. Mich., 1983), as persuasive authorities which support the insurer's argument that the homeowner's policy in question issued to Edward McIntyre and wife, Daisy McIntyre, affords no coverage under Alabama law with respect to the underlying tort action of Dawn Marie Yoder, a minor, against her grandfather, Edward McIntyre.

In Selected Risks Ins. Co. v. Bruno, supra, the facts and procedural history are stated as follows:

Selected Risks Insurance Company ("Selected Risks") issued a homeowner's insurance policy, effective June 29, 1978 to June 29, 1979, to Anthony V. Bruno and his wife, Lucy Bruno (the "Brunos"). The policy provided bodily injury liability coverage in the amount of Fifty Thousand Dollars ($50,000) and medical payment coverage in the amount of One Thousand Dollars ($1,000). Anthony Bruno, Jr. ("Bruno Jr."), the Brunos' son, was not a named insured on the policy. He was nevertheless an insured because he was a resident of his parents' household.

On June 20, 1979, Bruno Jr. and Joseph Whah exchanged heated words at the Robo Car Wash, approximately one block from the Brunos' home. Bruno Jr. struck Whah, watched him fall to the ground, and left. Whah died on November 5, 1979 as a result of his injuries. Bruno Jr. was subsequently convicted of the crime of simple assault in the Lackawanna County Court of Common Pleas. The executrix of Whah's estate brought a state court action against Bruno, Jr.,

seeking monetary damages for Whah's death.

On August 25, 1981, Selected Risks brought this diversity action seeking a declaratory judgment that it was not required to defend or afford coverage to the Brunos in the state wrongful death action. Selected Risks moved for summary judgment, relying on the undisputed fact that Bruno Jr. had been found guilty of simple assault. Selected Risks argued that damages resulting from the intentional assault were not covered because the insurance policy contained the following exclusionary clause:

"1. Coverage E—Personal Liability and Coverage F—Medical Payments *to others* do not apply *to bodily injury* or property damage:

a) which is expected or intended by the insured...." (emphasis in original).

718 F.2d at 68–69.

Much of the *Bruno* decision is concerned with the issue permitted by Pennsylvania law that an insurer cannot rely on an exclusion unless it shows that the insured was aware of the exclusion and that the exclusion's effect had been explained to him. *Id.* at 69–71. The insured here vigorously argued to no avail for the application of that rule.

The kernel of this Third Circuit holding predicting what the Pennsylvania Supreme Court would hold under the facts of the case is found in the last two paragraphs of the opinion:

An exclusion for intentionally caused injuries is not unusual, nor could an insured reasonably expect that a basic homeowner's policy would provide coverage for intentional criminal acts, particularly those committed away from the home. Indeed, such an expectation would be patently unreasonable. Presented with a similar factual situation, the Court of Common Pleas in *Kitzmiller v. Harleysville Mutual Insurance Co.*, 14 Pa.D. & C.3d 553 (1979), held that "any expectation that the

[homeowner's] policy provided protection against the pecuniary consequences of assaults was and is unreasonable as a matter of law." *Id.* at 559.

We believe that the Pennsylvania Supreme Court would hold that the *Hionis* rule does not apply to clearly unreasonable expectations of the insured. We also believe that it would agree with us and the *Kitzmiller* court that it is unreasonable as a matter of law for an insured to expect that a homeowner's insurance policy will provide liability coverage for intentional criminal acts. Therefore, we will reverse the judgment of the court below, and remand the case for further proceedings consistent with this opinion.

718 F.2d at 71.

*Allstate Ins. Co. v. Simms, supra,* involved an action brought in the United States District Court in Oregon wherein the insurer sought declaration that its homeowner's insurance policy did not provide coverage for claims arising out of the insured's killing of the victim. The insurer and insured filed cross-motions for summary judgment. The district court, applying Oregon law, held that under the Allstate homeowner's policy excluding coverage for bodily injury intentionally caused by the insured [24] coverage was not provided for the claim against the insured, even though the insured was acting in self defense.

The facts of this case are as follows:

The facts relevant to plaintiff's claim come from the transcript of defendant Zinn's criminal trial. They are not in dispute. Harold Simms, Jr., was shot and killed by Donald Zinn on January 1, 1982. Zinn was charged with the murder of Simms and with first degree manslaughter in the death of Charles Lewis. He was convicted of criminally negligent homicide in connection with the death of Simms.

At about 12:30 a.m. on the morning of the shooting, Zinn rested on his bed. He intended to pick up his fiancee after she

---

**24.** The insurance policy in *Simms* contains the following exclusion: "We do not cover bodily injury or property damage intentionally caused by an insured person." 597 F.Supp. at 66.

finished bartending at 2:30 a.m. Zinn was awakened when someone turned on the bedroom overhead light. Zinn recognized Lewis, a former boyfriend of his fiancee, standing in the bedroom doorway. Lewis demanded to talk to Zinn. Zinn jumped from his bed, rushed to the bedroom closet, and grabbed a loaded rifle. As Zinn began to back out of the closet, he was held by Simms. After a brief discussion, Simms released Zinn and Zinn unloaded several cartridges onto the bed. Simms backed out of the bedroom and seated himself in the living room. As Zinn left the bedroom he picked up the cartridges from the bed, pushed Lewis out of the bedroom and reloaded the rifle. As Lewis began to approach Zinn, Zinn pointed the rifle at Lewis, told him he was trespassing, and demanded that Lewis leave the house. Lewis continued to approach and Zinn repeated his demand. Zinn then shot Lewis. He then shot Simms as Simms was getting out of the chair. Simms advanced toward Zinn, and Zinn shot him a second time. Although Zinn could not recall shooting Simms more than twice, the coroner's report indicates that Simms was shot five times. Zinn testified that when he shot Simms he was aiming for the chest area.

597 F.Supp. at 65.

The opinion in *Simms* first notes that the district court had reviewed an identical exclusion in a previous Allstate case and in analyzing the Oregon cases construing similar exclusion clauses had determined that both the act causing the harm, and the harm itself, must be intended in order for coverage to be excluded. The court next observed that in the present case the evidence showed that Zinn intended to shoot Simms and intended to cause him bodily harm, although he may not have intended to cause the death of Simms. The court noted and questioned the credibility of the Zinn affidavit submitted with his cross-motion wherein Zinn swore that at no time during the transactions leading to the death of Simms did he intend any wrongful behavior but only intended solely to exer-

cise that degree of force which he honestly believed he was lawfully entitled to use in proper defense of himself. The court stated on the basis of the evidence it could not conclude that Zinn had consumed vast quantities of alcohol prior to the shooting incident nor could it conclude from the evidence that Zinn's consumption of alcohol substantially influenced his behavior at the time of the shooting.

The *Simms* court discussed the contention of defendants that Zinn's acts were not within the policy exclusion because Zinn was acting in self-defense when he shot Simms. Next discussed was defendant's misplaced reliance on *Brasseaux v. Girouard*, 269 So.2d 590 (La.Ct.App.1972), which determined on rehearing that where the insured shot the victim intentionally, and the shooting was unjustified, the exclusionary clause excluded coverage and relieved the insurer from liability. It was noted that the *Brasseaux* court was not presented with a situation where the insured was justifiably acting in self-defense.

The district court, sitting in Oregon, further noted that California appeared to follow the rule that where the insured causes injury while acting in self-defense, he is not precluded from coverage by an intentional injury exclusion, citing *Walters v. American Insurance Company*, 185 Cal.App.2d 776, 8 Cal.Rptr. 665 (1960), but observed that the California rule was influenced by an interpretation of section 533 of the California Insurance Code.

The *Simms* court next found and concluded that the Allstate homeowner's insurance policy issued to defendant Zinn did not provide coverage for claims arising from Zinn's intentional shooting of Simms and granted Allstate's motion for summary judgment on the basis of the following reasons:

The majority of courts hold, however, that an intentional injury exclusion precludes coverage for intentional injuries caused by the insured, even where the insured is acting in self-defense. *Lockhart v. Allstate Insurance Co.*, 119 Ariz.

150, 579 P.2d 1120 (Ariz.Ct.App.1978); *Clemmons v. American States Insurance Co.,* 412 So.2d 906 (Fla.Dist.Ct.App. 1982); *Hartford Accident and Indemnity Co. v. Krekeler,* 363 F.Supp. 354 (E.D. Mo.1973), *rev'd on the other grounds,* 491 F.2d 884 (8th Cir.1974).

In *Lockhart v. Allstate Insurance Co., supra,* the insurance company contended that its policy provided no coverage even if the insured was acting in self-defense at the time he allegedly shot the victim. The Arizona Court of Appeals held that the intentional injury exclusion precluded coverage. It provided the following rationale:

> The insurance policy excludes coverage for an intentional act of the insured which was intended to cause injury or which could be expected to cause injury. The question of self-defense presents an issue of motive or justification for an intentionally caused harm but does nothing to avoid the inference of intent to harm that necessarily follows [the victim]. *Home Insurance Company v. Neilson,* [165 Ind.App. 445, 332 N.E.2d 240 (1975)]. [The insured's] own statement demonstrates that he intended to shoot the gun and to cause injury. Whether he intended the precise injuries which occurred is immaterial. We are of the opinion that despite [the insured's] affidavit stating that he fired his gun only to protect himself and to prevent [the victim] from shooting at him, there is no factual issue as to his intent which would preclude summary judgment.

*Lockhart v. Allstate Insurance Co.,* 579 P.2d at 1122–23.

In *Clemmons v. American States Insurance Co.,* the insurance policy at issue excluded coverage of bodily injury either expected or intended from the standpoint of the insured. The court assumed the insured was acting in self-defense when he shot the victim. The court determined that the insured intentionally discharged a firearm while aiming it at the victim, and he intended and

expected to inflict serious bodily injuries. The court reasoned that without regard to whether the insured's actions were justified under criminal law concepts, he acted within the policy exclusion. *Id.* at 910.

I am persuaded by the *Lockhart* line of cases. I find that even if Zinn was acting in self-defense when he shot Simms, he is precluded from coverage by the intentional injury exclusion of his policy.

597 F.Supp. at 67–68.

In *Allstate Ins. Co. v. Sherrill, supra,* a homeowner's insurer brought a declaratory judgment action in the United States District Court for the Eastern District of Michigan to determine a question of insurance coverage for a series of particular outrageous acts committed by its insured, defendant Richard Sherrill, against defendant Elizabeth Vernier. Defendant Sherrill was the named insured under a homeowner's policy issued by Allstate that contained an exclusion for "bodily injury or property damage which is either expected or intended by the insured."

In an underlying civil action filed in state court Elizabeth Vernier sought damages from Sherrill based on his alleged tortious conduct. In this federal court action Allstate requested a determination that its homeowner's policy did not cover the acts of Sherrill and that it therefore had no duty to defend or indemnify him in the state court action.

The facts of the case recounted in the reported Memorandum Opinion and Order are as follows:

> The facts surrounding the underlying controversy are not materially in dispute. On December 2, 1980, at approximately 1:30 a.m. Sherrill entered the convenience store where Mrs. Vernier was employed as a cashier. Armed with a pistol, Sherrill directed Mrs. Vernier to empty the cash register. He then abducted her at gunpoint and forced her into his automobile. While driving about the back roads of St. Clair County, Sherrill ordered Mrs.

Vernier to undress and then tied her hands behind her back. Sherrill then drove to his home, took Mrs. Vernier inside and threatened to kill her if she made a sound. Sherrill then tied her to a bed and commenced a series of vile and atrocious sexual assaults. During the entire ordeal, Sherrill repeatedly threatened to murder Mrs. Vernier and "cut (her) up in pieces."

Sherrill ultimately released Mrs. Vernier and she was able to call the police. Sherrill was subsequently arrested and charged with armed robbery, kidnapping and first degree sexual conduct. He pled nolo contendere to armed robbery and was sentenced to a term of imprisonment of 6 to 20 years.

Sherrill claimed that he had ingested three pills or "hits" of mescaline (a hallucinogen), approximately a bottle and a half of schnapps, several bottles of beer and smoked two or three marijuana cigarettes or "joints" before entering the store on December 2, 1980. Prior to the preliminary examination in the criminal action, Sherrill was referred to a psychiatrist and found competent to stand trial. However, the forensic center report was consistent with Sherrill's claim that he has no recollection whatsoever of his actions on the night of December 2, 1980.

566 F.2d at 1287.

The *Sherrill* opinion observes that in interpreting similar policy exclusions Michigan courts had distinguished between an intention to commit the act which results in the harm and the intention to harm. If the harm was clearly anticipated, forseeable and expected, the exclusion applies, stated the court, and the insurer has no duty to defend or indemnify. Conversely, the court added, if the insured intended the act but not the resulting harm, the exclusion is not called into play. (citation of two Michigan cases omitted).

Allstate argued on appeal that the nature of Sherrill's acts as established by the undisputed facts indicated that the harm to Elizabeth Vernier was clearly anticipated, forseeable and expected. The district court

in response wrote that the Michigan courts concurred in Allstate's argument and had held that absent an allegation of provocation, negligence or accident on behalf of the insured, criminal acts such as Sherrill's which evidenced a clear causal relationship between the act and harm fall within the intentional harm exclusion. The court cited *Kermans v. Pendleton*, 62 Mich.App. 576, 233 N.W.2d 658 (1975) (act in shooting bar patron clearly establishes intent to harm); *Group Insurance Co. v. Morelli*, 111 Mich. App. 510, 314 N.W.2d 672 (1981) (assault and battery by insured establishes intent to harm); and *Wright v. White Birch Park*, 118 Mich.App. 639, 325 N.W.2d 524 (1982) (assault and battery by insured establishes intent to harm).

Sherrill argued on appeal in reply that his acute voluntary intoxication resulted not only in an inability to form the intent to harm but that he lacked the capacity to intentionally act. Therefore, Sherrill's argument concluded that his inability to form the intent to act precluded a finding that the resulting harm was intended. Thus Sherrill maintained that Allstate's reliance on *Kermans*, *Morelli* and *Wright* was illfounded. Finally, Sherrill argued that the issue of his intent to act or harm was a factual one, requiring the trier of fact to weigh conflicting inferences and thus was inappropriate for summary judgment.

The district court in *Sherrill* after stating the insured's position entered its judicial reaction to the respective positions of plaintiff and defendants by asserting that upon careful review the court believed the competing claims and allegations of the parties (as set forth) placed before the court a more fundamental and perhaps dispositive question of law. Accordingly, wrote the court, it must initially determine whether the insured's actions in voluntarily ingesting hallucinogenic drugs and alcohol prevent the insured, as a matter of law, from asserting a lack of capacity defense to an insurer's claimed exclusion under an "intentional injury" clause when that defense is based solely on the effects of the alcohol and/or drugs.

Recognizing the lack of guidance on this issue, the United States District Court in *Sherrill* stated its belief that if confronted with this question the Michigan courts would be constrained to hold that such a defense is not available to one whose alleged incapacity results *solely* from a voluntary ingestion of alcohol or drugs.

The reasoning of the *Sherrill* court, entered in support of its predictive holding, appears at p. 1288 of 566 F.Supp.:

As indicated in *Kermans, Morelli* and *Wright, supra,* the Michigan courts have not hesitated to infer an intent to harm and thus exclude coverage where the harm results from certain criminal acts. While these decisions are clearly based on sound applications of established legal principles, presumably they are nurtured by public policy concerns weighing against the creation of an unwelcome and potentially damaging precedent. Likewise this Court believes that public policy demands that a voluntary departure of one's good judgment and rational decision-making abilities should not permit the insured to abrogate his financial responsibility to those he brutally injures.

Further, the Court believes the Michigan state legislature would concur in such a holding. Although the legislature has not spoken directly to this issue, the Court is not without their direction. As a matter of policy, the legislators of Michigan have determined that the voluntary consumption of alcohol or drugs may not form the basis of legal insanity defense to a criminal charge. M.C.L.A. § 768.21a(2). Thus Michigan distinguishes between a lack of mental capacity due to mental illness and that which results from acute voluntary alcohol or drug intoxication. In the latter situation,

even though a criminal defendant's freedom and liberty are at stake, a defense of voluntary intoxication may not be tendered. To allow such a defense would create an intolerable precedent of self-immunity.

This reasoning applies equally in a civil context. Accordingly, the Court holds that where an insured voluntarily ingests alcohol or drugs he may not assert a defense to an exclusionary clause such as the one at bar based on his lack of capacity to form the intent to act or harm, where that defense is based solely on the effects of the alcohol and/or drugs.

Absent such a defense (indeed the only defense presented), the Court believes, based upon a review of the undisputed facts, that Sherrill's acts clearly fall within the exception for "bodily injury or property damage which is either expected or intended from the standpoint of the insured." *See Kermans, Morelli* and *Wright, supra.*

Plaintiff's motion for summary judgment is GRANTED. A judgment in favor of plaintiff accompanies this Memorandum Opinion and Order.

566 F.Supp. at 1288.

[Analysis of Cases Cited By Insurer]

*Selected Risk Ins. Co. v. Bruno,* 718 F.2d 67 (3rd Cir.1983), applying Pennsylvania state law via Third Circuit prediction of what the Pennsylvania Supreme Court would hold, stands for the proposition that "the reasonable expectation of the insured is the focal point" of insurance transactions such as there faced by the court [25] and for the principle (an explicit part of Pennsylvania law to be applied, according to Third Circuit prediction, in construing an exclusionary clause in a homeowner's insurance

---

**25.** The *Bruno* court, 718 F.2d at 71, cited *Keeton, Insurance Law Rights at Variance With Policy Provisions,* 83 Harv.L.Rev. 961 (1970), as pointing out that the purpose of judicial regulation of contracts of adhesion in the insurance law context is to protect the "objective reasonable expectations of applicants and intended beneficiaries, *Id.* at 967, and for the statement that only objectively reasonable expectations are

protected because such a standard provides "an essential degree of certainty and predictability about legal rights, as well as a method of achieving equity not only between insurer and insured but also among different insureds whose contributions through premiums create the funds that are tapped to pay judgments against insurers." *Id.* at 968.

1218

policy identical to the one in the instant case) that it is unreasonable as a matter of law for an insured to expect that a homeowner's insurance policy will provide liability coverage for intentional criminal acts.

The Alabama courts have not applied this enunciated *Bruno* principle to the knowledge of this judge, sitting in Alabama, and the Court declines to predict or speculate in this case whether the Supreme Court of Alabama would adopt and follow it if faced with an appellate record the same or substantially similar to the record now before the Court in this declaratory judgment action. Moreover, the pronouncements of *Dyer* and its progeny appear to implicitly reject the application of such principle in cases involving the construction of the so-called "intentional injury"[26] exclusionary clause.

The Court's response to *Allstate Ins. Co. v. Simms,* 597 F.Supp. 64 (D.Oregon, 1984), cited by State Auto Mutual as supportive of its position, is to say simply and succinctly that the rule of law therein applied and followed by the district court (even if an insured is acting in self-defense when he intentionally shoots another, he is precluded from coverage by the intentional injury exclusion of his homeowner's insurance policy) is: (1) not applicable in the case at bar; and (2) is not yet declared to be the law of the State of Alabama.

Finally, *Allstate Ins. Co. v. Sherrill,* 566 F.Supp. 1286 (E.D.Mich.1983), urged upon the Court by counsel for State Auto Mutual "as one of the strongest cases ... I was able to find," which quotes the Michigan courts as concurring in Allstate's argument in that case that the nature of the insured's acts as established in the undisputed facts indicate that the harm [to his victim] was clearly anticipated, foreseeable and expected, and as holding that absent an allegation of provocation, negligence or accident on the behalf of the insured, criminal acts such as Sherrill's which [evince] a clear

causal relationship between the act and harm fall within the intentional harm exclusion [566 F.Supp. at 1287], is obviously at war with the pronouncement of *Dyer,* 454 So.2d at 925, that:

> Because the presumption in tort and criminal law that a person intends the natural and probable consequences of his or her intentional acts has no application to the interpretation of the terms used in the "expected or intended from the standpoint of the insured" policy exclusion, the policy term, "expected or intended injury," cannot be equated with "forseeable injury."

454 So.2d at 925.

Moreover, applicable Alabama case law seems to be otherwise at odds with the Michigan cases of *Kermans, Morelli* and *Wright* cited approvingly by the *Sherrill* court. Furthermore, the predictive Michigan law of *Sherrill,* 566 F.Supp. at 1288, "that the Court believes that if confronted with this question the Michigan courts would be constrained to hold that such a defense [based on effects of alcohol or drugs] is not available to one whose alleged capacity results solely from a voluntary ingestion of alcohol or drugs" obviously has no application here, even if it had been declared before now to be the law of Alabama by Alabama's highest appellate court.[27]

## RESULT OF ANALYSIS OF APPLICABLE ALABAMA CASE LAW AND CASES FROM ALABAMA'S SISTER JURISDICTIONS

After careful consideration of the pronouncements of *Dyer* and its progeny and the pronouncements of the cases from other states hereinabove cited and discussed, this Court concludes that the Supreme Court of Alabama cannot align itself with any of its sister jurisdictions which have decided the precise or similar issue now

**26.** Thought by the Court to be a misnomer.

**27.** Ironically, under the undisputed facts of *Sherrill* and applying the pronouncements of *Dyer* and progeny by use and application of a

purely subjective standard in interpreting the exclusionary clause in Sherrill's homeowner's insurance policy, the result reached would be the same as reached in *Sherrill.*

before this Court, excepting New Hampshire, without repudiating and overruling the pronouncements of *Dyer* and its progeny. Moreover, the Court now holds by reasoned prediction that if faced with the precise issue now before this United States District Court the Supreme Court of Alabama will continue to firmly adhere to its *Dyer* and *Dyer*-related pronouncements, at the same time rejecting the foreign case law proposition, emanating presumably in Minnesota, that a bodily injury is expected or intended by an insured "when the character of the act is such that an intention to inflict an injury can be inferred as a matter of law," and will consequently refuse to apply the policy exclusion in the context of the nonviolent type and content of sexual abuse by an adult of a minor of tender years and attendant facts as involved in the case at bar. If the Supreme Court of Alabama means what it says,[28] the policy exclusion inquiry under Alabama law of whether a bodily injury is expected or intended by an insured is a question of fact for the jury or judge and a purely subjective standard governs such factual determination.

## APPLICABILITY OF NON–APPLICABILITY OF BURNHAM SHOES CASE

■ The Court is not unmindful of *Burnham Shoes, Inc. v. West American Ins. Co., et al.,* 784 F.2d 1531 (11th Cir. 1986), wherein the following questions, yet unanswered, were certified and submitted by the Eleventh Circuit Court of Appeals on March 25, 1986 to the Supreme Court of Alabama for its consideration pursuant to Rule 18, Alabama Rules of Appellate Procedure:

(1) Is an insurance provision which otherwise would obligate the insurer to defend the insured in a lawsuit based upon intentional wrongs alleged to have been committed by the insured void as against the public policy of the state of Alabama?

(2) Does an insurer who undertakes to defend an insured without reserving the right to withdraw its defense thereby waive its right to do so? If so, is the insured obligated to continue providing a defense even if to do so would otherwise be against public policy?

784 F.2d at 2533.

In *Burnham Shoes* the plaintiff Burnham Shoes, Inc. ("Burnham") appeals from the district court's decision on summary judgment that the defendant insurance companies (the insureds) were not obligated to defend Burnham in an antitrust suit brought by a competitor. The insurers argued, and the district court held, that any provisions in Burnham's policies which otherwise would have required the insurers to defend the suit[29] void as against public policy. Though not conceding the point, Burnham responded that in any event the insurers had waived their right to deny coverage by beginning a defense without reserving the right to withdraw. The district court, however, accepted the insurers' argument that coverage prohibited by public policy cannot be created by waiver.

The Eleventh Circuit in *Burnham* succinctly stated the circumstances dictating its decision to certify and submit the questions above set out to the Supreme Court of Alabama:

In *St Paul Insurance Cos. v. Talladega Nursing Home,* 606 F.2d 631, 633–34 (5th Cir.1979), we held that Alabama public policy voids insurance coverage purporting to create a duty on the part of the insurer to defend an antitrust suit alleging intentional acts by the insured calculated to cause injury. If *St. Paul* is still good law, it appears to control the public policy issue here. Burnham argues, however, that *St. Paul* has been stripped of its precedential value by two later decisions of the Alabama Supreme Court. In *Alabama Farm Bureau Mutual Casualty Insurance Co. v. Dyer,*

---

**28.** This federal judge, sitting in diversity, believes that it does. .

**29.** The district court did not reach the issue of whether the policies did, in fact, create a duty to defend.

454 So.2d 921, 925 (Ala.1984), the court held that a policy limitation applying to acts "intended from the standpoint of the insured" extends only to those acts which the insured specifically intended to cause injury. The court held in *Industrial Tile, Inc. v. Stewart*, 388 So.2d 171, 175–76 (Ala.1980), *cert. denied*, 449 U.S. 1081, 101 S.Ct. 864, 66 L.Ed.2d 805 (1981), that a tortfeasor may be indemnified against the consequences of his or her own "wrongs." The term "wrongs" in context referred to acts of negligence, but Burnham suggests that the language taken literally could extend to intentional acts as well.

The waiver issue did not arise in *St. Paul*, and it appears that no reported Alabama decision discusses the issue in the context now before us. The Alabama courts have held that coverage not provided by the terms of a policy cannot be created by waiver or estoppel, *Home Indemnity Co. v. Reed Equipment Co.*, 381 So.2d 45, 50–51 (Ala.1980), and that a contract prohibited by public policy cannot be given validity by estoppel. *Standard Chemical Co. v. Barbaree*, 239 Ala. 601, 195 So. 892, 893 (1940), but Burnham points out that it has apparently not been decided whether a public policy constraint, as opposed to a limitation based on the policy's language, may be overcome by waiver as opposed to estoppel.

Since the issues before us pose questions of Alabama law which may determine the outcome of this appeal and for which there are no clear controlling precedents in the decisions of the Alabama Supreme Court, we submit the following to that court for its consideration. 784 F.2d at 1532.

The public policy defense raised by the insurers in *Burnham*, albeit tardy, was not asserted expressly or by implication in this declaratory judgment proceeding by State Auto Mutual. Moreover, the Court declines to now raise such defense for the insurer sua sponte or to stay its declaratory judgment herein until the Supreme Court of Alabama answers the questions certified in *Burnham* and the Eleventh Circuit thereafter renders its opinion in the *Burnham* appeal now pending,[30] unless directed so to do by higher authority.

## COLLATERAL ESTOPPEL

■ There is no collateral estoppel issue raised or argued in the instant declaratory judgment proceeding by reason of Edward McIntyre's felony conviction of sexual abuse in the first degree in the criminal case based upon the 1984 incident or by reason of the result in the underlying tort action. Moreover, under the pronouncements of the Supreme Court of Alabama in *Smith v. North River Ins. Co.*, 360 So.2d at 315, and *Dyer*, 454 So.2d at 925, the Court concludes that the precise issue or issues in the present litigation are different from the issues in the criminal case and in the underlying tort action and are to be determined by the application of different standards.

Counsel for State Auto Mutual does argue in post bench hearing brief that the jury's award of punitive damages to Dawn Marie Yoder in the underlying tort action in effect "indicates" that the jury felt that the insured Edward McIntyre intended the acts of sexual abuse upon his minor granddaughter and either knew or should have known that injury to the minor child would result from his acts. However, the question of this insured's intent in the personal injury action is not the same as the question of "expected or intended" injury in the

30. This Court is not suggesting or implying that the public policy defense alluded to in *Burnham* could or should have been asserted by the insurer in the present declaratory judgment action or that it would have been a viable defense if it had been asserted. The Court is constrained to make two observations. First, if it is legally possible under Alabama law for an insurer to waive such defense, it has occurred here. Secondly, under Alabama case law now existing the question of whether the alleged acts of the insured are "intentional wrongs" may be answered one way in a tort case or a criminal action and another way in a declaratory judgment action for construction of an insurance policy exclusion which is the same or similar to the policy exclusion in the instant case.

present homeowner's insurance policy exclusion. *North River Ins. Co.*, at 315. Furthermore, the policy term "expected or intended injury" cannot be equated with "forseeable injury," *Dyer* at 925, because the presumption in tort and criminal law that a person intends the natural and probable consequences of his intentional acts has no application to the interpretation of the terms used in the "expected or intended from the standpoint of the insured" policy exclusion. *Id.*

Any finding of fact deemed as or properly constituting a conclusion of law is hereby adopted as a conclusion of law. Any conclusion of law deemed or properly constituting a finding of fact is hereby adopted as a finding of fact.

## CONCLUSION

The plaintiff State Auto Mutual Insurance Company has failed to meet its burden of proof in this declaratory judgment action that its insured, Edward McIntyre, possessed the specific intent to cause bodily injury to his minor granddaughter, Dawn Marie Yoder, by his nonviolent sexual abuse of her in the summers of 1983 and 1984 during her vacation visits in the McIntyre home or that he then subjectively possessed a high degree of certainty that bodily injury to his minor granddaughter would result from his acts. Moreover, the Court reaffirms its findings of fact set out on pp. 40–42, inclusive, and using a purely subjective standard in testing those facts, as it is bound to do by Alabama law, now finds and holds as a finding of fact and a conclusion of law that the insured, Edward McIntyre, on the two occasions in question neither expected or intended to inflict bodily harm upon this minor child. The insurer, State Auto Mutual Insurance Company, is therefore obligated under its homeowner's insurance policy to indemnify its insured, Edward McIntyre, with respect to the results of the underlying tort action, to the extent of the policy coverage.

An appropriate declaratory judgment will be entered in conformity with views and holdings herein expressed.

## ORDER

In conformity with the Memorandum of Decision issued contemporaneously herein, it is

ORDERED, ADJUDGED, DECREED and DECLARED that defendant Edward McIntyre had no specific intent to cause bodily harm to his minor granddaughter, Dawn Marie Yoder, when he sexually abused her in a nonviolent way on the two summer occasions in 1983 and 1984 when the child was visiting in the McIntyre home in Lauderdale County, Alabama, nor did he subjectively possess at the time of such episodes, or either of them, a high degree of certainty that bodily injury to his minor granddaughter would result from his acts. And it is further

ORDERED, ADJUDGED, DECREED and DECLARED that plaintiff State Automobile Mutual Insurance Company is therefore obligated under its Homeowner's Policy No. HGP 7 359 258, and the succeeding renewal thereof, to indemnify its insured, defendant Edward McIntyre, with respect to the result of that certain underlying tort action in the United States District Court For The Northern District of Alabama, Northwestern Division, designated as CV 86–HM–5237–NW, and styled "Dawn Marie Yoder, a minor who sues by and through her mother and next friend, Terry Buck, Plaintiff [Jimmy Sandlin, as Guardian Ad Litem] vs. Edward McIntyre, Defendant" wherein the 11–year old minor plaintiff recovered judgment against her defendant grandfather in total amount of $125,000.00 [compensatory damages in amount of $50,-000.00 and punitive damages in amount of $75,000.00], to the extent of the policy coverage. And it is further

ORDERED that the costs of this action are taxed against plaintiff.